521 So.2d 236 (1988)
Esther FRIEDGOOD, Appellant,
v.
PETERS PUBLISHING CO., et al., Appellees.
No. 4-86-2674.
District Court of Appeal of Florida, Fourth District.
February 24, 1988.
Rehearing Denied March 28, 1988.
Arnold R. Ginsberg of Horton, Perse & Ginsberg, and Hoppe & Backmeyer, Miami, for appellant.
Thomas R. Julin and Donald M. Middlebrooks of Steel Hector & Davis, Miami, for appellee-Peters Pub. Co.
ANSTEAD, Judge.
This is an appeal from a final summary judgment entered in favor of the defendant publishing company in a defamation action brought by the appellant, Esther Friedgood. We affirm.
Esther Friedgood filed a defamation complaint against Peters Publishing Company, publisher of Us magazine, alleging as defamatory comments about her contained in a review of a book concerning her father, Dr. Charles Friedgood, who had been convicted of the murder of his wife, Esther's mother. Relying on this court's opinion in Della-Donna v. Gore Newspapers Company, 489 So.2d 72 (Fla. 4th DCA 1986), the trial court held that Esther was a "limited public figure" under the defamation law and was required to prove not only that the published comments about her were false and defamatory but were published out of motives of "actual malice" by the publisher. The trial court further held that the record showed no evidence from which a reasonable jury could find actual malice by clear and convincing evidence. On appeal Friedgood challenges the trial court's determination *237 of her status as a "limited public figure" and holding as to the lack of proof of actual malice.

FACTUAL BACKGROUND
The underlying facts of this case are undisputed[1] and reflect a family tragedy culminating in a mother's death at the hands of the father by poisoning, the father's subsequent efforts to avoid detection, and his attempts to misuse his emotionally vulnerable children in those efforts. Dr. Charles Friedgood and his wife Sophie lived in Kensington, Long Island. They had had six children who, by June of 1975, were grown and not living at home. Dr. Friedgood had a lucrative medical practice but had run afoul of the tax laws and the abortion laws. He also had a mistress who had given birth to his two out-of-wedlock children. Esther and her husband had just graduated from law school and were planning to visit Esther's parents the same day Dr. Friedgood was later determined to have killed his wife by injection with Demerol.
Dr. Friedgood signed his wife's death certificate stating the cause of death was stroke. Mrs. Friedgood had had a stroke years earlier, but had almost entirely recovered from it. The assistant district attorney was suspicious of the fact a husband had signed the death certificate of his wife. The family was already in Hazelton, Pennsylvania, Mrs. Friedgood's hometown and prospective burial place, when the burial was stopped by court order and an autopsy performed because of the police suspicion. The autopsy revealed no evidence of stroke, and tissue and organ samples were taken before burial proceeded. When the family returned to Kensington they found a police detective waiting who asked the maid, Lydia, to go with him to the police station for questioning. Esther volunteered to go with her. At the station, the assistant district attorney questioned Esther about Dr. Friedgood's private life. She told him about her father's mistress and the two out-of-wedlock children and also disclosed her father's financial problems and tax evasion conviction.
After toxicologists determined that Mrs. Friedgood died of a massive overdose of Demerol, the district attorney obtained a search warrant for Demerol bottles and a hypodermic syringe at the Friedgood home. He and several detectives went to the home with the warrant. Esther answered the door and went to get her husband and Dr. Friedgood. The detectives then showed the warrant and began the search while the family members waited on the porch with friends who were making a condolence call. Dr. Friedgood, standing in the living room doorway, unsuccessfully attempted to speak to Esther in Yiddish. Finally he told her cryptically in English that bottles and syringe were in an upstairs file cabinet. Esther told her sister Beth that their father wanted Beth to get these items, but Beth refused. Esther then went upstairs by a back stairway and took the items from the top drawer of the file cabinet in her father's den, secreting them in her clothing. She went downstairs, then back up to her sister Toba's room and showed her the items. Esther later testified that it was then that Toba told her that the police were looking for Demerol. Esther put the items in a bag and later showed them to her husband, who noticed the word Demerol on the bottle.
After the police left, Esther's husband called Dr. Friedgood's attorney, John Palmer. Esther, Richard and Toba met with Palmer later in the day, but Palmer said he had a conflict of interest and could not advise them. When the trio returned to the house Esther washed all fingerprints from the items, put them back in the bag and put the bag in a coat pocket in a closet. On her father's inquiry she told him where they were. Some days later, when Esther checked the coat pocket, the items were gone. Three days after the police search of the Friedgood home, Dr. Friedgood called home from Kennedy Airport to say *238 he was leaving his car there and was going away for a few days' rest. His daughter Dvorah's husband called the assistant district attorney, and Dr. Friedgood was removed by police from a London-bound airplane, already out on the runway.[2] He was carrying a large bag. Esther seized the bag after Friedgood was returned to the house by his attorney. In it she found substantial and valuable personal property of her mother, which she dispersed to various hiding places. Later she returned them to the bag and turned it over to her father-in-law, who had an attorney inventory the items.
Two weeks later, Esther's sister Toba, after revealing to maternal relatives the information about Esther's concealment of the bottles and syringe, went to the police with the same information. The police then went to the house and told Esther they thought she was guilty of obstruction of justice by her actions. She called a lawyer with the firm for which her husband was clerking, and accompanied the police to the station at their request. Her husband's law firm asked Jonathan Rosner, a criminal attorney, to represent her and he went to the station house. According to Rosner, the assistant district attorney told him Esther had been arrested for being an accessory after the fact in her mother's killing. Rosner was concerned about the impact of the charges on her legal career as well as on her and her husband personally. Ultimately, Rosner reached an understanding with the assistant district attorney: If Esther voluntarily gave a truthful statement, there would be no arrest record, and she would be free to go. Esther gave the statement. The assistant district attorney stated for the record that the chief assistant district attorney had authorized him to say she would not be prosecuted; Rosner elaborated, for the record, on the understanding reached, to indicate there was to be no formal record of her being arrested by the officers.
Subsequently Esther, her husband and her sisters testified before the grand jury. Dr. Friedgood was indicted and eventually tried. Esther testified against him, but only after resisting extradition from Florida on the ground she feared injury to the baby she was carrying. Dr. Friedgood's trial was highly publicized. Media articles told of Esther's hiding the hypodermic and Demerol bottle during the police search of the house, her discovery of her mother's property in her father's bag at the time of his aborted flight attempt, Toba's telling the assistant district attorney about Esther's concealment of the evidence, and other matters. Dr. Friedgood told a newspaper reporter his children had set him up for the conviction so they could inherit their mother's estate; that Esther was "misinformed" about the finding of the bottles and syringe, and that he was trying to secrete his wife's valuables on Esther's advice, in order to keep the IRS from getting them. Dr. Friedgood was convicted of second degree murder and second degree grand larceny and sentenced to 25 years to life in prison.
In 1980, Leonard Levitt, a news reporter who had covered the story extensively, published a book about Dr. Friedgood's career and the murder of his wife. Its thrust was to use the Friedgood case to suggest that members of the medical profession covered up for each other  even for a chronic mal-practitioner. Anita Shreve, a free lance writer, was asked by the editor of Us magazine to write a review of this book. Ms. Shreve read the book, interviewed the author, and submitted her review to the editor. Kaplan assigned a researcher, Vicki Jo Radovsky, to check the facts. Radovsky wrote the captions under the photographs obtained by Us to accompany the review and submitted the package to Kaplan for approval. The review together with pictures and captions appeared in the April 14, 1981, issue of Us. The pictures were obtained from the publisher of the newspaper, Newsday, in which Levitt's original news articles on the case had *239 appeared. The same photos appeared on the dust jacket of Levitt's book.

THE DEFAMATION ACTION
Esther alleged that comments about her in the Us article were false and defamatory. Specifically, she cites a photograph of her with a caption that stated: "The accomplice: Esther Friedgood hid evidence of the crime in an upstairs file cabinet at her father's request." Esther also claimed the following passage in the review was defamatory:
When the police arrived with a search warrant, Friedgood confided in his daughter Esther, and convinced her to hide the evidence, thus involving her in the murder. Later she, in turn, confided in another sister, and they went to the police.
Esther claims that she is a private person who did nothing to invite public attention sufficient to be classified as a public figure under the defamation law. She also claims that even if she is considered to be a public figure there is sufficient evidence of actual malice in the record to require this issue to be submitted to a jury.

THE DEFAMATION LAW
Because free speech is part of the foundation of our society and incorporated in the federal constitution, the traditional law of defamation has been reshaped to avoid intrusion upon free speech rights. One result has been the development of a policy that permits a greater latitude in speech the more public the person or event that is the subject of the speech. Under that policy a public figure, such as a candidate for public office, would have to prove not only that he was defamed but that the publisher of the defamation acted with actual malice toward him. On the other hand, a private person need only prove that she was defamed and that the publisher acted negligently in publishing the defamation. In Della-Donna v. Gore we held that a lawyer-trustee of a trust that benefitted a local university was a limited public figure with reference to alleged defamatory statements made during a legal dispute with other trustees over local control and funding of the university. In Della-Donna this court also restated some of the basic principles of defamation law that are pertinent to the issues raised here:
1. The proof required in a defamation case depends upon (1) whether the alleged defamation arose out of a matter of public concern or out of a matter of private concern, and (2) whether the plaintiff is a public official, public figure or limited public figure, or is a private person.
2. To determine whether a person is a public figure with reference to the published statements, there is a three part test that requires affirmative responses to each of the following: (1) whether there is a public controversy; (2) whether the plaintiff played a sufficiently central role in that controversy; and (3) whether the alleged defamation was germane to plaintiff's involvement in that controversy. Gertz v. Robert Welch, Inc., 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). Under this test it may be possible for someone to become a public figure through no purposeful action of their own.
3. If it is determined that the plaintiff is a public figure, it must be shown that the published statements were not only false and defamatory but were published with actual malice by the publisher.

PUBLIC FIGURE STATUS
Both sides have cited cases finding or rejecting public figure status for plaintiffs in a variety of factual settings, most of which we find dissimilar to the facts presented here.[3] We also reject the publisher's claims that Esther's status as a lawyer or as a one-time candidate for a local public office controls the outcome here. Rather, we believe the central issue is whether Esther's role in her father's criminal case was sufficient to make her a public figure for purposes of the defamation law and whether that status continued even after the criminal prosecution was terminated.
In Street v. National Broadcasting Company, 645 F.2d 1227 (6th Cir.1981) the *240 plaintiff was the alleged white rape victim in the widely publicized Scottsboro Nine case where nine Southern black youths were accused of rape in 1931. In the course of that litigation the plaintiff was the focus of numerous press interviews and her version of the case was widely disseminated outside of actual courtroom testimony. After the litigation she disappeared from public view. A defamation suit was brought more than 40 years later after NBC televised a dramatization of one chapter of the book Scottsboro: A Tragedy of the American South by an historian, Dr. Daniel Carter. The book was based on the trial court's findings at the 1933 trial of one of the defendants, the transcript of the trial, contemporaneous newspaper reports of the trial and interviews with the trial judge and others. The book suggests that Street's testimony was false. The plaintiff claimed she was a private figure and that even if she had been a public figure at the time of trial, she had long since resumed her role as a private figure. The court rejected both claims.
In evaluating Street's status under the three-part test of Gertz, the 6th Circuit observed that not all judicial proceedings involve public controversies. Cf. Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) (divorce litigation between private parties not public controversy). However, several factors led the court to conclude that the Scottsboro criminal trials involved the kind of public controversy referred to in Gertz:
They [the Scottsboro trials] were the focus of major public debate over the ability of our courts to render even-handed justice. It generated widespread press and attracted public attention for several years. It was also a contributing factor in changing public attitudes about the right of black citizens to equal treatment under law and in changing constitutional principles governing the right to counsel and the exclusion of blacks from the jury.
Street, at 1235. The court then considered the nature and extent of plaintiff's participation by noting that she played a prominent role in the case and the attendant public controversy. She was the only alleged victim and she was the state's major witness in the prosecution of the nine black youths. The evidence also indicated that plaintiff recognized her importance to the criminal trials and was aware of the public's interest in her as a personality. The press secured numerous interviews from her and she was able to broadcast her view of the events. The issue of whether Street voluntarily thrust herself into the controversy was seen by the court as the most troublesome. If she had falsely accused the defendants, her participation in the controversy would be voluntary. However, if indeed plaintiff had been raped, her participation in the trial would be involuntary for the purpose of determining her public figure status. The court concluded that legal standards in libel cases need not be drawn so that either the courts or the press must first determine the issue of truth before they can determine whether an individual should be treated as a public or a private figure. In the event that the issues of truth and voluntariness are the same and are in dispute, the court concluded that the public figure status may be determined without regard to whether the individual had initially thrust herself into the case. In such a case, the other factors, prominence and access to media, alone may be examined to determine public figure status. In Street, the court concluded that there was evidence of active participation in the controversy not bound up with the issue of truth. That participation was evidenced by Plaintiff's granting of press interviews and promoting her version of the case outside of the courtroom. The court concluded that Street had become a public figure:
In the context of a widely-reported, intense public controversy concerning the fairness of our criminal justice system, plaintiff was a public figure under Gertz because she played a major role, had effective access to the media and encouraged public interest in herself.
Id. at 1235.

DURABILITY OF PUBLIC FIGURE STATUS
The plaintiff in Street also argued, as does the appellant here, that even if she *241 was a public figure at the time of the 1930's trial, she lost her public figure status over the intervening forty years. The 6th Circuit held:
We reject this argument and hold that once a person becomes a public figure in connection with a particular controversy, that person remains a public figure thereafter for purposes of later commentary or treatment of that controversy.

(Emphasis supplied.) Street, at 1235, citing Brewer v. Memphis Publishing Co., 626 F.2d 1238 (5th Cir.1980) (plaintiff sued when a newspaper implied that she was reviving a long-dormant relationship with Elvis Presley); Meeropol v. Nizer, 560 F.2d 1061, 1066 (2d Cir.1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978) (sons of Julius and Ethel Rosenberg are public figures for purposes of subsequent commentary on Rosenberg trials since they spent their earlier years in the limelight). The Street court's rationale on this issue is well reasoned:
Our analytical view of the matter is based on the fact that the Supreme Court developed the public figure doctrine in order that the press might have sufficient breathing room to compose the first rough draft of history. It is no less important to allow the historian the same leeway when he writes the second or the third draft... . A contrary rule would tend to restrain efforts to shed new light on historical events and reconsideration of past errors.
Street, at 1236.

THE FRIEDGOOD CASE
In applying the above analysis to the present case, we believe important parallels can be drawn. As a starting point we note that both involved public criminal trials which the public and the press had a constitutional right to attend and to freely disseminate information gained by attendance. Although it cannot be denied that the Scottsboro trials were far more significant in a political, social, and legal sense than was the murder trial of Dr. Friedgood, the fact remains that both cases were initially highly publicized criminal prosecutions out of which other political and/or legal issues arose.[4] The Friedgood prosecution and its attendant publicity was analogous, albeit on a much smaller scale, to the circumstances surrounding the Scottsboro case. Like the plaintiff in Street, Esther Friedgood was the prosecution's star witness. Without her testimony, the state would have had considerable difficulty in convicting her father for her mother's murder. In addition, the record reflects that both Street and the appellant at bar had ample "access to channels of effective communication and hence ... a ... realistic opportunity to counteract false statements." Street, at 1234, quoting Gertz, 418 U.S. at 344, 94 S.Ct. at 3009. The newspaper clippings in the record reflect numerous instances where appellant had granted interviews, including a long series published in "Sunday Newsday."
Finally and most importantly, it appears to be undisputed in this case, unlike Street, that Esther, by her voluntary actions, thrust herself into the criminal investigation and prosecution of her father. She was made aware soon after her mother's death of the police suspicions of her father. Even if she could be deemed to be unaware of the significance of the Demerol and syringe at the actual moment that she removed them from her father's office, the record shows that immediately after finding them she was told by her sister that it was those very items that the police were seeking. Consequently, whether she actually believed at the time that her father was the murderer was irrelevant to the issue that she voluntarily chose to conceal evidence for which she knew the police were searching. Her actions in hiding the items from the police, wiping off the fingerprints, and concealing the items in a place which she then disclosed to her father, *242 can be characterized, at the very least, as conduct destined to inject her deeply into the murder investigation and prosecution. Her subsequent concealment of the contents of the suitcase her father had attempted to remove from the country in his aborted flight to Denmark also reflects her continued participation in the critical events leading up to her father's trial and conviction. In our view all of these actions justify her designation as a limited public figure for purposes of comment about the Friedgood trial based upon the Street analysis which applies the Gertz rationale.
We also believe, for the same reasons set out by the court in Street, that Esther retained her status as a public figure even after the criminal trial of her father had ended. We have already discussed the facts underlying our conclusion that a public controversy was involved. Unlike Street, we do not have a 40-year interval but rather one of a few years. Esther's father remains incarcerated and, the record reflects, still professes his innocence. It would seem reasonable under these circumstances to conclude that public discussion about the case may continue. Accordingly, in our view appellant should be deemed a limited public figure for purposes of the comment about her in the book review. Under this analysis, reports about Esther's conduct during the time of the criminal investigation and trial would be protected and, to sustain a defamation action, Esther would not only have to prove that the reports were false and defamatory but also that they were made with actual malice towards her.

ACTUAL MALICE
We also believe there is a lack of evidence of actual malice. Actual malice analysis should start with whether the plaintiff can offer prima facie evidence that the publication is false. As this court stated in Byrd v. Hustler Magazine, Inc., 433 So.2d 593, 595 (Fla. 4th DCA 1983), a false statement of fact is absolutely necessary if there is to be recovery in a defamation action. The same opinion points out that allegedly defamatory words must be read in the context of the entire publication. Id. at 595, and cases cited there. If the case could not possibly have a defamatory effect the complaint may be dismissed or a directed verdict granted. Id., citing Wolfson v. Kirk, 273 So.2d 774, 778 (Fla. 4th DCA 1973). The trial court must evaluate the publications not by extremes, but as the common mind would naturally understand it. Id., citing McCormick v. Miami Herald Publishing Co., 139 So.2d 197, 200 (Fla. 2d DCA 1962). "In other words, the statement should be considered in its natural sense without a forced or strained construction." 433 So.2d at 595. Here, the appellant relies almost exclusively on inferences to be drawn from the loose use of words in the review describing her conduct such as "criminal," "accomplice" and "horrible" to establish actual malice.[5] Unlike Street, the plaintiff here is not being accused of giving false testimony. Rather, the alleged defamatory material is a characterization of conduct substantially admitted by the plaintiff to have occurred. In our view it is questionable whether these comments are defamatory. In any case, the use of these remarks and the inferences to be drawn therefrom as evidence of actual malice fall well short of the clear and convincing standard mandated by the U.S. Supreme Court.
The comments about appellant were hardly more than a restatement of the news reports of her testimony at trial. Here the outline under appellant's picture used the word "accomplice," which appellant suggests conveys the idea that she was an accomplice in the murder of her mother, rather than an accessory subsequently in concealing evidence against her father. However, the outline itself went on to refer to appellant's hiding of evidence at her father's request. The main text also makes clear that the characterization of *243 appellant's conduct as "an accomplice," "horrible" and "criminal" all refer to the actions of appellant in concealing, at her father's request, the items for which the police were searching. We agree with the trial court that it would not be possible, based on the undisputed facts in the record before us, to prove by clear and convincing evidence the falsity of the publication, defendant's knowledge of the falsity of what was published, or reckless disregard based on a suspicion of its falsity, both essential predicates to establishing actual malice.
Accordingly, for the reasons set out above we affirm the summary final judgment.
DELL and GUNTHER, JJ., concur.
NOTES
[1] In setting forth the facts in this opinion, we have placed substantial reliance on the rendition of facts as presented by appellant.
[2] It was learned that Dr. Friedgood had been enroute to Denmark for a rendezvous with his mistress.
[3] See e.g., Wolston v. Reader's Digest Association, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); and Shiver v. Apalachee Publishing Company, 425 So.2d 1173 (Fla. 1st DCA 1983).
[4] While the Scottsboro case resulted in widescale reforms in the jury system and right to counsel, the record reflects that the Friedgood prosecution resulted in the passage of the "Dr. Friedgood Bill," a prohibition of the practice in New York of physicians being permitted to sign the death certificates of relatives, as well as continued criticism of the medical profession's alleged self protection by a code of silence concerning the misdeeds of its members.
[5] In Hay v. Independent Newspapers, Inc., 450 So.2d 293 (Fla. 2d DCA 1984) the Second District held that the words "criminal" and "crook" were statements of opinion, not facts, and hence not defamatory.