573 So.2d 65 (1990)
Edward FRIDOVICH, Appellant,
v.
Michael Henry FRIDOVICH, Anthony Steven Fridovich, Kevin Gleaton, Debbie Gleaton, Michael Giannoutsos and James Giannoutsos, Appellees.
No. 89-1880.
District Court of Appeal of Florida, Fourth District.
December 28, 1990.
Rehearing and Rehearing Denied January 28, 1991.
*66 David P. Rhodes of Glenn, Rasmussen, Fogarty, Merryday, & Russo, Tampa, for appellant.
Jeffrey D. Fisher, Palm Beach, for appellee, Anthony Steven Fridovich.
Robert L. Valentine of Robert L. Valentine, P.A., Lakeland, for appellee, Debbie Gleaton.
Eric P. Littman of Berley & Littman, P.A., Miami, for appellee, Michael Henry Fridovich.
Rehearing and Rehearing En Banc Denied January 28, 1991.
WARNER, Judge.
This is an appeal from a final order dismissing with prejudice Edward Fridovich's third amended complaint. The issues presented are whether the complaint stated causes of action for intentional infliction of emotional distress, defamation, malicious prosecution, and conspiracy. We affirm in part and reverse in part.
This case involves a bizarre and sorry story. The facts are contained in the allegations of the complaint filed by Appellant which for purposes of a motion to dismiss are to be taken as true:
2. On December 4, 1981, Martin Fridovich was accidentally shot by Edward Fridovich, then 18 years old, while Edward was cleaning his shotgun. Martin Fridovich died from the resulting injuries.
3. Martin Fridovich was the father of plaintiff Edward Fridovich and defendants Erica Sue Fridovich, Michael Henry Fridovich, Anthony Steven Fridovich, and Debbie Gleaton. Defendant Kevin Gleaton is Debbie Gleaton's husband. Defendant Michael Giannoutsos is Erica Fridovich's former husband, and defendant James Giannoutsos is Michael Giannoutsos's brother.
4. Law enforcement authorities conducted an extensive investigation after the death and concluded that Martin Fridovich died as a result of an accident. No criminal charges were filed.
5. Martin Fridovich's will named Edward Fridovich personal representative of Martin Fridovich's estate, which totals several million dollars.
6. Defendants became dissatisfied with Edward's status as personal representative of the estate and president of the primary estate asset, Agri-Leis Corp. Anthony Fridovich, who was furious that his younger brother had been named personal representative, initiated a conspiracy among the Defendants to (a) have Edward removed as personal representative and (b) deprive Edward of his share of the estate assets. Anthony Fridovich suggested to the other defendants that they take whatever steps were necessary to ensure that Edward was convicted of intentionally causing his father's death.
7. The defendants, Erica Sue Fridovich, Michael Henry Fridovich, Anthony Steven Fridovich, Kevin Gleaton, Debbie Gleaton, Michael Giannoutsos, and James Giannoutsos, conspired to have Edward Fridovich falsely arrested, convicted, and sentenced for the intentional shooting and killing of Martin Fridovich.
8. In furtherance of the conspiracy, Anthony Fridovich and Michael Giannoutsos purchased a stress analyzer to determine which of the defendants could lie most convincingly. Michael Giannoutsos traveled to New York to train in the use of the machine. The defendants practiced lying while using the machine to determine which of the defendants should make false statements in furtherance of the conspiracy. Anthony Fridovich and Debbie Gleaton "failed" the lie detector test, so Anthony told Erica Fridovich and Michael Giannoutsos that they should falsely state that Edward intended to kill his father.
9. Anthony Fridovich induced Michael Giannoutsos to lie about Edward Fridovich's intent by promising Michael Giannoutsos a position with the Agri-Leis Corp. Anthony Fridovich induced Erica Fridovich to lie about Edward Fridovich's intent by promising to provide for Erica and her daughter.

*67 10. Defendants fabricated a series of incidents and statements by Edward, about which Erica Fridovich and Michael Giannoutsos were to lie. Anthony Fridovich pored over letters written by Edward in an attempt to locate tangible documents that could be used  wrongly  to evidence Edward's intent to kill his father. For example, Anthony discovered a letter to Erica in which Edward wrote that he wanted to "push it to finish it." Although Anthony knew that this reference had absolutely nothing to do with Martin Fridovich's killing, Anthony convinced Erica to falsely state that the letter actually referred to Martin Fridovich's killing.
11. Ten months after Martin Fridovich's death, and long after the investigation had been closed, Michael Giannoutsos and Erica Fridovich (the two "best" liars, according to the stress analyzer) voluntarily appeared before law enforcement authorities and falsely claimed that Edward had plotted to kill his father. Defendants, via their chosen representatives, Michael Giannoutsos and Erica Fridovich, encouraged the authorities to initiate a new investigation into Martin Fridovich's death and, more particularly, charge Edward with first-degree murder.
12. As a direct result of those lies, the Broward County State Attorney's Office reopened the case. Also as a direct result of these lies, Edward was indicted for first-degree murder in the death of his father.
13. Erica's false statements to investigators, provided voluntarily and at the behest of the other defendants, include the following:
(a) That Edward told her on numerous occasions that he planned to kill their father and that the murder was his "fantasy";
(b) That Edward told her that he planned to purchase explosives so that he could kill their father in an automobile explosion;
(c) That Edward offered Michael Giannoutsos ten thousand dollars (and later, twenty thousand dollars) to kill their father or have their father killed; and
(d) That Edward told her that he would kill their father in a gun "accident."
14. Michael Giannoutsos provided similar false statements to investigators, voluntarily and at the behest of the other defendants. In addition to corroborating Erica's false statements (see paragraph 13), Michael Giannoutsos made other false statements as well, including that Edward told him, "if I shoot him I'd really like to shoot him right between the eyes because I hate him."
15. Michael Giannoutsos's voluntary statements to the authorities, like Erica Fridovich's, were false and were not part of any proceeding or ongoing investigation.
16. When the trial occurred, Erica Fridovich and Michael Giannoutsos testified falsely in an attempt to frame Edward Fridovich for Martin Fridovich's murder. Both Erica Fridovich and Michael Giannoutsos testified falsely that Edward Fridovich told them that he had planned to kill Martin Fridovich.
17. In addition to their initial false statements to the authorities and their false testimony at trial, Erica Fridovich and Michael Giannoutsos gave false statements to others as well, including the Assistant State Attorney, Edward Fridovich's attorney, Erica's attorney, a private investigator hired by Erica, and in conjunction with a civil wrongful death action. In each of these instances, they falsely stated that Edward Fridovich plotted to and intended to kill his father. Each of these false statements was in furtherance of the defendants' conspiracy.
18. Erica Fridovich has admitted in a sworn statement that her previous statements to authorities about Edward's intent were lies. A copy of Erica's sworn recantation of her false statements is attached to the amended complaint and incorporated in this pleading by reference. Attached as composite Exhibit A to this pleading are two Ft. Lauderdale News/Sun Sentinel articles, dated November *68 7, 1986 and November 8, 1986, in which Erica Fridovich and Michael Giannountsos (sic) announce their recantations. In the November 8 article, Erica announces that "The entire case against my brother was the result of a family conspiracy."
19. Additionally, in furtherance on the conspiracy, Erica Fridovich falsely told Eva Foreman, the family housekeeper, that Edward had killed his father and planned to kill Ms. Foreman. Erica Fridovich asked Ms. Foreman to concur with the conspirators' false statements. The conspirators felt that corroboration by Ms. Foreman, who was very close to Edward, would increase the conspiracy's likelihood of success. Erica Fridovich offered Ms. Foreman $35,000 for her assistance, an offer that Ms. Foreman refused.
20. Shortly before the trial, the prosecutor informed Michael Giannoutsos that "there was a good possibility of an acquittal" of Edward. Because an acquittal would permit Edward to remain personal representative and collect his inheritance, contrary to the conspirators' intent, Michael Giannoutsos attempted to hire a professional killer to murder Edward. Giannoutsos's plan was thwarted because he was introduced to an undercover sheriff's deputy rather than an actual hitman.
Edward was tried for first degree murder but convicted of manslaughter in his first trial. This court reversed for a new trial, Fridovich v. State, 489 So.2d 143 (Fla. 4th DCA 1986), in which he was tried for and again convicted of manslaughter. Fridovich v. State, 537 So.2d 648 (Fla. 4th DCA 1989), approved 562 So.2d 328 (Fla. 1990).
Count I of the complaint alleged the publication of false and defamatory statements to the investigators for the Broward Sheriff's office, state attorney's office and others, Count II alleged a conspiracy by all defendants to defame appellant. Count III alleged the intentional infliction of emotional distress by conduct "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency." Count IV alleges a conspiracy between the appellees to intentionally inflict emotional distress. In his second amended complaint appellant also alleged a claim for malicious prosecution and a conspiracy count based on the malicious prosecution action. These were dismissed with prejudice, which appellant also challenges.

DEFAMATION
With respect to the count for defamation, appellee claims that the complaint fails to state a cause of action because (1) "defamation" is not a cause of action; (2) that the essential elements of the cause of action were not pled; (3) that the allegations were substantially true; (4) that the statements were absolutely privileged as preliminary to a judicial proceeding.
The semantic distinction between "defamation" and "libel or slander" in the title of the cause of action is of no concern to us if the pleading alleges a valid cause of action. See Delacruz v. Peninsula State Bank, 221 So.2d 772 (Fla. 2d DCA 1969). We would also note that Florida Jurisprudence 2d lists "Defamation" as a title subject, and the standard jury instructions refer to "Defamation" in their title.
Whether appellant is a public or private figure and the defamation arose out of a matter of public concern under defamation law, see Friedgood v. Peters Pub. Co., 521 So.2d 236 (Fla. 4th DCA 1988) will determine what the plaintiff must prove. However, if appellant is considered a limited public figure because of the criminal incident, see Friedgood, the plaintiff would have to prove the publication of a false and defamatory statement with actual malice, causing injury to plaintiff. The complaint sufficiently alleges all of these matters. Furthermore, what appellant claims is untrue are the statements that appellant intentionally and with premeditation killed his father. It is for the trier of fact to determine whether these statements are substantially true and, if so, whether they were made with malice and caused damage to the appellant. Therefore, we find no *69 merit to the first three arguments made by appellee.
Finally, Appellee claims that the statements upon which the cause of action are based are all privileged. The claim of privilege is a defense to an action for defamation. See Abraham v. Baldwin, 52 Fla. 151, 42 So. 591 (1906). Thus, the complaint can be dismissed on the basis of a defense only if the existence of such defense is apparent from the face of the complaint, Vaswani v. Ganobsek, 402 So.2d 1350 (Fla. 4th DCA 1981).
According to the allegations of the complaint, all the statements, save the one to Eva Foreman, were made to the investigating authorities to instigate prosecution or were made during the trial. Statements made during judicial proceedings are absolutely privileged, no matter how false and malicious. Robertson v. Industrial Insurance Company, 75 So.2d 198 (Fla. 1954); Pledger v. Burnup & Sims, 432 So.2d 1323 (Fla. 4th DCA 1983). However, the concern we have here is similar to what was addressed in Pledger: namely, whether or not statements which occur before a judicial proceeding rather than in the course of a judicial proceeding are privileged. In this case we must answer the question of whether statements made to an investigating officer or to the state attorney are absolutely privileged.
In Pledger, Judge Dell fully recited the case history of the privilege attached to pre-litigation statements. He first noted Ange v. State, 98 Fla. 538, 123 So. 916 (Fla. 1929), which held that an absolute privilege extends to all judges, parties, counsel and witnesses "and arises immediately upon the doing of any act required or permitted by law in the due course of the judicial proceeding or as necessarily preliminary thereto." Ange, 123 So. at 917 (emphasis added). However, the absolute privilege is limited by the requirement that such statements during the course of the proceeding must be related to the inquiry before the court. Myers v. Hodges, 53 Fla. 197, 44 So. 357 (1907). Despite such direction from earlier cases, pre-litigation statements have been treated in a disparate manner. Judge Dell wrote in Pledger:
The Supreme Court held statements made to the insurance commissioner to be absolutely privileged in Robertson v. Industrial Insurance Company, 75 So.2d 198 (Fla. 1954), because the statements were necessary to institute license revocation proceedings. However, our sister court, in Ridge v. Rademacher, 402 So.2d 1312 (Fla. 3d DCA 1981), held an unsworn statement to a police officer about an alleged crime qualifiedly rather than absolutely privileged. In Merriman v. Lewis, 141 Fla. 832, 194 So. 349 (1940), the defendant included a libel in a sworn statement to an insurance company. This statement was the basis for a claim that defendant intended to enforce in court, if necessary, and the statement also constituted the preliminary proof of loss necessary to sustain an action against the insurer. The Supreme Court held this statement qualifiedly rather than absolutely privileged.
432 So.2d 1323. We add to that list Buchanan v. Miami Herald Publishing Co., 206 So.2d 465 (Fla. 3d DCA 1968) which in a footnote cites with approval the case of Hott v. Yarborough, 112 Tex. 179, 245 S.W. 676 (1922) holding that a letter written to the district attorney charging a violation of criminal law and asking that the matter be brought before a grand jury was absolutely privileged.
We view Robertson and Ridge to be in conflict unless a distinction can be made that in Robertson the communication was directly to the insurance commissioner who would be the official responsible for instituting proceedings, while the statement in Ridge was made to a police officer who does not have the authority to file the criminal charges in court. The fact that the statement was unsworn in Ridge does not seem to us to be a distinguishing feature, because in Robertson an unsworn letter was given absolute privilege status.
Moreover, we find conflict across the country as to whether statements made to investigating authorities regarding the perpetration of crimes are absolutely or *70 qualifiedly privileged. Appellees cite us to Ducosin v. Moth, 292 Or. 764, 642 P.2d 1168 (1982) which held that a statement to a medical examiner performing an autopsy on a body was subject to absolute privilege. The court quoted Prosser on Torts with approval in the following comment:
Analogous cases are those in which the defendant made a defamatory complaint to the prosecuting attorney. "Although there is some authority to the contrary, the better view seems to be that an informal complaint to a prosecuting attorney or a magistrate is to be regarded as an initial step in a judicial proceeding, and so entitled to an absolute, rather than a qualified immunity." Prosser, Law of Torts, § 114, pp. 780-781 (4th ed. 1971). "Formal or informal complaints to a prosecuting attorney or other law enforcement officer concerning violations of the criminal law are absolutely privileged under the rule stated in § 587." Restatement of Torts (Second), § 598, Comment e.
Restatement of Torts § 587 is not entirely supportive of the quote. The provision itself states:
§ 587. Parties to Judicial Proceedings. A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, the matter has some relation to the proceeding.
However, Comment e to the section states:
e. As to communications preliminary to a proposed judicial proceeding, the rule stated in this Section applies only when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.
Thus, under the Restatement Rule as interpreted in Comment e the statements to the investigators in this case would not be absolutely privileged as there was no active investigation and there was no "good faith" in the contemplated institution of proceedings by defendants.
Appellant on the other hand directs us to other states which hold that statements to investigatory authorities are only imbued with a qualified privilege. For instance Packard v. Central Maine Power Co., 477 A.2d 264, 268 (Me. 1984) holds:
Communications made to law enforcement officials for the purpose of aiding in the detection of crime are privileged if made in the belief, based on reasonable grounds, that they are true.
Similar holdings are found in Paramount Supply Co. v. Sherlin Corp., 16 Ohio App.3d 176, 475 N.E.2d 197 (Ohio Ct. App. 1984), and Crump v. Crump, 393 So.2d 337 (La. Ct. App. 1980).
Pledger also discussed the concept of qualified privilege as set forth in Coogler v. Rhodes, 38 Fla. 240, 21 So. 109 (1897):
Where a person is so situated that it becomes right, in the interest of society, that he should tell to a third person certain facts, then, if he bona fide, without malice, does tell them, it is a privileged communication. Townsh.Sland. & L. (4th Ed.) § 209. This definition is considered more exact in leaving out the word "duty," because it is privileged in the interest of society for a man to bona fide and without malice say those things which no positive legal duty may make it obligatory upon him to say. Id. That the matter stated in accordance with the above definition with good motives, and upon reasons apparently good, should turn out to be untrue, will not render the publisher liable.
21 So. at 112.
It seems to us that the qualified privilege addressed in Pledger is sufficiently protective of parties wishing to report events concerning crime and balances society's interest in detecting and prosecuting crime with a defendant's interest not to be falsely accused. However, it also appears to us *71 that Robertson is the case most factually akin to the present circumstances, and we are compelled to follow the Supreme Court pronouncement and determine that the statements made to investigating authorities prior to the filing of criminal charges are absolutely privileged. Nevertheless, we certify the question for resolution by the Supreme Court as one of great public importance.
However, the statement made by Erica Sue Fridovich to Eva Foreman does not fall within the scope of an absolute privilege. Because the statement accuses the appellant of killing his father, it is actionable per se. Shiell v. Metropolis Co., 102 Fla. 794, 136 So. 537 (1931). While we would have reversed the dismissal of Count I as to Erica, a notice of voluntary dismissal of the appeal as to Erica has been filed.
Since we hold that an absolute privilege existed as to the statements to the authorities, there can be no action for conspiracy to commit the defamation, "in view of the principle that the gist of the charge is the slander itself, which as we have already held, is non-actionable under the facts of the case at bar." Robertson, 75 So.2d at 200; Wright v. Yurko, 446 So.2d 1162 (Fla. 5th DCA 1984). Nevertheless, we reverse the dismissal of Count II in so far as it relates to a conspiracy as to the defamatory statements published to Eva Foreman.

MALICIOUS PROSECUTION
We affirm the dismissal of the count for malicious prosecution. Although appellant was not convicted of first degree murder, he was convicted of manslaughter, a lesser included offense. One of the essential elements of an action for malicious prosecution is a bona fide termination of the prior judicial proceedings in favor of the plaintiff (appellant). Dorf v. Usher, 514 So.2d 68 (Fla. 4th DCA 1987). A conviction of a lesser included offense, even though the individual is exonerated on the greater charge, is not a termination in favor of appellant. Warriner v. Burdines, Inc., 93 So.2d 108 (Fla. 1957). Likewise, the cause of action for conspiracy to maliciously prosecute is itself non-actionable. Buchanan v. Miami Herald Pub. Co., 206 So.2d 465 (Fla. 3d DCA 1968), modified on other grounds, 230 So.2d 9 (Fla. 1969). Where the complaint fails to allege an essential element of the underlying tort of malicious prosecution, a cause for conspiracy to maliciously prosecute is not stated. Cf. Buckner v. Lower Florida Keys Hospital Dist., 403 So.2d 1025 (Fla. 3d DCA 1981) (Holding that where complaint failed to allege publication, it failed to allege a cause of action for conspiracy to defame since a cause of action for defamation was not stated.)

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
Appellant's complaint tells a story of incredible greed and outright criminal acts (perjury) by the defendants to deprive the appellant of his position as personal representative of his father's estate as well as his rightful share as an heir of the estate. In order to accomplish this result appellees convinced the authorities to charge appellant with first degree premeditated murder. First degree murder of course carries with it a possible penalty of death. Thus, in a very real way, the defendants' actions not only attempted to eliminate appellant as an heir, but also attempted to eliminate him permanently. Furthermore, their purpose could only be accomplished through a murder conviction, because a manslaughter conviction would not prevent appellant from participation in his father's estate. Nable v. Godfrey's Estate, 403 So.2d 1038 (Fla. 5th DCA 1981).
In Metropolitan Life Insurance Co. v. McCarson, 467 So.2d 277 (Fla. 1985), the Supreme Court adopted the Restatement (Second) of Torts, § 46 (1965) which provides:
§ 46 Outrageous Conduct Causing Severe Emotional Distress.
(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
*72 The Supreme Court also recognized the application of the comments in the Restatement which provide:
d. Extreme and outrageous conduct. ... It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
467 So.2d at 278-279. "With regard to the sufficiency of the allegation to state a cause of action, it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." Scheller v. American Medical Intern., Inc., 502 So.2d 1268, 1271 (Fla. 4th DCA 1987).
In Norman v. General Motors Corp., 628 F. Supp. 702 (D.C.Nev. 1986), the trial court denied defendant's motion to dismiss claim for intentional infliction of emotional distress. Plaintiff alleged that G.M., as his employer and in a position of power over plaintiff, initiated a drug investigation with knowledge that plaintiff had not committed any offense or with reckless disregard as to whether he had or not. The court held that the allegations met the threshold requirement of the tort and reasonable persons could differ on the question of whether there was outrageous conduct.
In Lashley v. Bowman, 561 So.2d 406 (Fla. 5th DCA 1990), another case alleging intentional infliction of emotional distress, the Fifth District indicated that the Restatement's standard set forth in Metropolitan v. McCarson was subject to inconsistent subjective application by the courts. The court stated, "The Restatement, the commentators and this court all agree that outrageousness is more likely to be found where some relationship exists that gives the defendant actual or apparent authority over another or power to affect his interests." Lashley v. Bowman, 561 So.2d 406-410. In line with Lashley, in the instant case the defendant's relationship to appellant with regard to the estate of their father gave the defendants the power to affect directly appellant's interests. We find that the allegations are sufficient to state a cause of action for intentional infliction of emotional distress so as to pass the threshold test of a motion to dismiss for failure to state a cause of action. Therefore, we reverse the dismissal of the count charging intentional infliction of emotional distress as well as the conspiracy count based thereon.
We thus affirm the dismissal of the counts for defamation and malicious prosecution, including the conspiracy counts, except as to the conspiracy count with respect to the defamatory statements made to Eva Foreman, and reverse the dismissal of the counts charging intentional infliction of emotional distress and remand for further proceedings.
We also certify the following question to the Supreme Court:
Are statements made by a private individual to an investigating officer or a prosecutor preliminary to the filing of a criminal charge absolutely privileged so as to avoid liability for defamation even when the statements are false and made with actual malice?
DELL and GARRETT, JJ., concur.