625 A.2d 959

**CALDOR, INC. et al.**

v.

**Samuel David BOWDEN, An Infant.**

**No. 37, Sept. Term, 1992.**

Court of Appeals of Maryland.

June 9, 1993.

---

Venture does not appear to rely directly on this statutory provision in support of its argument in this Court.

634

Patricia M. Thornton (McCarthy, Bacon & Costello, both on brief), Landover, for appellant.

Allan J. Rabineau, Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

In the instant case Samuel Bowden brought suit against his employer Caldor, Inc. (Caldor) and three Caldor employees alleging false imprisonment, wrongful discharge, malicious prosecution, defamation, and intentional infliction of emotional distress. Bowden succeeded on the merits of his case and the jury awarded compensatory damages separate-

ly for each of the five counts. In addition, the jury found that punitive damages were warranted. After a separate hearing, the jury granted a punitive damages award apparently based on all five tort counts, but it did not allocate the portion of the punitive damages award attributable to each count. At a post-trial hearing, the circuit court granted a motion for judgment not withstanding the verdict (J.N.W.V.) setting aside the judgment on two of the counts but leaving the entire punitive damages award intact. We granted certiorari to consider the circuit court's rulings on the motion for J.N.W.V., as well as whether a new trial on the issue of punitive damages is required when a trial court grants a J.N.W.V. for some of the compensatory counts that form the basis for a general punitive damages award in a multiple count suit. We hold that in this case a new trial to recalculate punitive damages is necessary.

## I.

In reviewing the circuit court's decision to both grant in part and deny in part the defendant's motion for J.N.W.V., we must "view the evidence in the light most favorable to the plaintiff and resolve all conflicts in the plaintiff's favor." *Kentucky Fried Chicken Nat'l Management Co. v. Weathersby*, 326 Md. 663, 666, 607 A.2d 8, 9 (1992); *Lehman v. Baltimore Transit Co.*, 227 Md. 537, 540, 177 A.2d 855, 857 (1962). Therefore, we present the facts of this case from Bowden's point of view.

In March 1988, the respondent Samuel Bowden was sixteen years old when he applied for a position with Caldor, Inc., a national retail store. Caldor hired Bowden as a customer service representative and assigned him to its hardware department. In the early evening of June 15, 1988, Bowden arrived at Caldor to report for his 5:45 p.m. shift. Bowden went to punch in his time card and discovered that his time card was missing. He went to the acting store manager, Ms. Baldwin, to inquire about its absence. Baldwin, without further explanation, simply instructed

Bowden to report to his normal post in the hardware department.

At approximately 6:45 p.m., Baldwin paged Bowden and instructed him to meet her at the upstairs customer service desk. Bowden ascended the escalator and met Baldwin at the customer service desk as instructed. Baldwin told Bowden that she needed his assistance and then led Bowden to a 10' × 10' windowless office on the upper level of the store.

Once inside, Bowden found Mr. Hedrick and Mr. Hodum, two of Caldor's loss prevention personnel, standing in the room. Bowden had not met either man before. The small office contained only a desk, two chairs, and a telephone. Hedrick greeted Bowden, instructed Bowden to sit down, and then closed the door, leaving Bowden alone with the two strangers.

Bowden was unaware why he was summoned to the upper-office. He asked Hedrick how long he would be there. According to Bowden, Hedrick replied "I don't think you'll be leaving anytime soon." Hedrick then sat down behind the desk and Hodum stood behind Bowden, blocking Bowden's potential egress from the small room. Hedrick asked Bowden a few casual questions about his personal life. Growing tired of the small talk and feeling the pressure of his surroundings, Bowden "bluntly" asked "what was my purpose for being in this room?" Hedrick replied that there had been some missing money and merchandise which had been traced back to Bowden.

Bowden denied this accusation and attempted to leave, but found Hodum blocking the door. Hedrick then stated "sit down or we'll help you sit down." Fearing reprisal, Bowden sat back down. When Bowden attempted to use the phone to contact his parents, his attempt was met by a similar, more emphatic, warning—Hedrick ordered Bowden "to put the damn phone down or [I'll] help [you] do it." On several occasions, Bowden could hear himself paged over the store's PA system. Bowden explained that his mother

might be trying to contact him at the store and would be worried if she could not find him. Hedrick did not permit Bowden to respond and told Bowden that, if his mother called, they would tell her that Bowden was not in the store. This further disturbed Bowden.

Hedrick began interrogating Bowden. According to Bowden, Hedrick "kept drilling" him about the missing money. The series of accusations and denials went back and forth. The men forced Bowden to empty his pockets and reveal the contents of his wallet. Hedrick told Bowden that they had videotapes showing him stealing money from the registers and that he would not be permitted to leave until he cooperated.[1]

The interrogation continued until approximately 8:00 p.m., when Hedrick placed a blank "voluntary statement" form in front of Bowden. Hedrick then told Bowden that he wanted a written statement from him admitting that he had taken amounts of money on a number of occasions. He told Bowden that if he signed the form, made restitution, and did not involve his parents that Caldor would not contact the police. Out of fear, Bowden gave in to Hedrick's demand. On the first side of the form, Hedrick dictated the terms of Bowden's "admission," specifying the dates and amounts of money. Bowden finally signed the first side at 9:35 p.m. After Bowden completed the first side of the page, Hedrick left the room for thirty or forty minutes. Upon Hedrick's return, Bowden realized that the store was closed and all of the store lights were off. Hedrick then dictated the terms of the second side of the form, which Bowden signed. Hedrick told Bowden to return the next day and repay the money. Around 11:00 p.m., over four hours after Bowden was first summoned to the upstairs office, Hedrick allowed Bowden to leave the store.

---

1. The defendants never produced any videotape showing Bowden stealing money from the registers at either Bowden's juvenile adjudicatory proceeding or at the civil trial from which this appeal arises.

Bowden arrived home at 11:30 p.m., an hour later than usual. Bowden's mother met him at the door and demanded an explanation for his tardiness. Bowden told his mother what had happened and denied stealing any money.

Bowden and his mother returned to Caldor the next afternoon. They went to the upstairs manager's office and asked to talk with Hedrick. Mrs. Bowden was informed that Hedrick had left the store. Instead, Mrs. Bowden spoke with Mr. Mehan, the store's security manager, and Mr. Forrester, another store manager, to inquire about the prior night's activities and to attempt "to get to the bottom of things." An argument ensued and, according to Bowden, Forrester barked "You people—you nigger boys make me sick, but you're going to burn for this, you sucker." Bowden further testified that Mehan's only response to the exchange was "sort of a smirk" indicating his agreement with the remark.

Bowden and his mother left the store and returned to their car. Mehan followed them into the parking lot, approached them, and told Bowden that he could not leave. Mehan then seized Bowden's arm and forced him to return to the store through the rear employee entrance. Mehan led Bowden back to his office on the ground floor.

Mrs. Bowden followed Mehan and her son back to Mehan's office, where she called her husband, Reverend Horace Bowden. Rev. Bowden and Mehan discussed the events on the telephone, and Mehan demanded restitution. When Rev. Bowden asked to see the videotapes before making restitution, Mehan refused and stated that he had no other choice but to arrest Bowden and then hung up. Mehan handcuffed Bowden and called the Baltimore County Police. Mehan then escorted the handcuffed Bowden across the lower level of the store, up the escalators, and led him from the back of the upper level to the front door. Bowden remained in handcuffs in public view until the police arrived.

On December 16, 1988, a juvenile proceeding was held before Master Richard J. Gilbert. Bowdeñ had filed a motion to suppress his written statement, but after hearing the testimony of Hedrick, Hodum, and Bowden on the circumstances surrounding Bowden's written statement, Master Gilbert denied Bowden's motion to suppress. Following the denial of Bowden's motion, a juvenile adjudicatory hearing was held. The State called Hedrick and Mehan and introduced Bowden's written statement. At the close of the State's case, Bowden moved to dismiss the charges. Master Gilbert denied the motion. When defense counsel indicated he was prepared to call witnesses, Master Gilbert responded "that's up to you." Apparently taking this as a favorable sign, defense counsel indicated that, although he was prepared to call Bowden and his mother, he now decided to submit and waive argument. The State also waived argument and submitted, whereupon, Master Gilbert found that there was insufficient evidence to convince him beyond a reasonable doubt that Bowden committed a theft.

Bowden then filed a civil suit in the Circuit Court for Baltimore City, naming Caldor, Hedrick, Hodum, and Mehan as defendants. The complaint alleged counts of false imprisonment, malicious prosecution, defamation, wrongful discharge, and intentional infliction of emotional distress. The case was tried before a jury, and on August 20, 1991, the jury rendered a decision in favor of Bowden. The jury awarded a total of $110,000 in compensatory damages. The verdict sheet asked the jury to itemize the damages attributable to each tort count. They awarded $10,000 for false imprisonment, $25,000 for defamation, $25,000 for malicious prosecution, $25,000 for wrongful discharge, and $25,000 for intentional infliction of emotional distress.

In addition to the compensatory awards, the jury found that Bowden had proven, by a preponderance of the evidence, that he was entitled to punitive damages. Thereafter, Bowden presented evidence of the defendants' financial means, the court instructed the jury, and both sides gave

closing arguments on the issue of punitive damages. On August 21, 1991, the jury awarded Bowden a total of $357,500 in punitive damages against the defendants: $350,-000 against Caldor, $3,000 against Hedrick, $3,000 against Hodum, and $1,500 against Mehan. The punitive damages award against the defendants did not indicate how the award was to be allocated among the five causes of action presented.

The defendants filed a motion for judgment not withstanding the verdict/remittitur and/or for a new trial. The circuit court granted the motion for J.N.W.V. on the wrongful discharge and intentional infliction of emotional distress counts, but denied the motion for J.N.W.V. on the other three counts and denied the motion for remittitur and for a new trial. The circuit court left the punitive damages award intact, despite the grant of J.N.W.V. on two of the underlying causes of action. Bowden and the defendants appealed and we granted certiorari prior to the appeal being argued in the intermediate appellate court.

II.

The parties have raised several issues on appeal. We first review the circuit court's partial grant and partial denial of J.N.W.V. on the tort claims, and we affirm the decision. Next, we review the circuit court's refusal to grant a new hearing on punitive damages, and we reverse that decision.

A. Intentional Infliction of Emotional Distress

In 1977, this Court recognized the tort of intentional infliction of emotional distress in *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977). In *Harris*, we identified the "four elements which must coalesce to impose liability for intentional infliction of emotional distress." *Id.* at 566, 380 A.2d at 614. We stated:

"(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe."

*Id. Harris* cautioned that courts must assure that each of the four elements of the tort are established by legally adequate proof. *Harris* and our subsequent cases have also noted "two problems which are inherent in recognizing a tort of this character ... (1) distinguishing the true from the false claim, and (2) distinguishing the trifling annoyance from the serious wrong." *Id.; Figueiredo–Torres v. Nickel,* 321 Md. 642, 653, 584 A.2d 69, 75 (1991); *Young v. Hartford Accident & Indem. Co.,* 303 Md. 182, 197, 492 A.2d 1270, 1277 (1985). In addition, we have made it clear that liability for the tort of intentional infliction of emotional distress should be imposed sparingly, and " 'its balm reserved for those wounds that are truly severe and incapable of healing themselves.' " *Figueiredo–Torres,* 321 Md. at 653, 584 A.2d at 75 (quoting *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 61, 502 A.2d 1057, 1065, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986)).

At the trial, Bowden testified about the mental and psychological effects he experienced after the incident. According to Bowden's testimony, he was distraught and worried; he "was hurt a lot" and felt ashamed because his peers saw him being removed from Caldor in handcuffs. Bowden also testified that he tended not to socialize as much as before, kept to himself, and did not trust others very readily. He stated that he was able, however, to continue his normal activities. He further testified that the incident did not affect his schoolwork; he continued playing baseball for his high school team and obtained other employment soon thereafter. In short, Bowden continued doing the same things that he did prior to the incident but just had "a different outlook." Bowden's "sadness" and insecurity continued for more than a year and as a result he paid one visit to a psychologist in the winter of 1990. At trial Bowden only introduced the psychologist's intake form and did not call the psychologist as a witness. In the intake

form Bowden complained of weight loss over the past four months and reported that he felt "sad," "confused," and "bad about himself." The intake form did not contain any of the psychologist's conclusions; it only reported Bowden's own complaints. Bowden testified that he visited the psychologist only once because of his time commitments to both school and extracurricular activities. Bowden presented no expert testimony about his emotional distress.

At the hearing on the defendants' motion for J.N.W.V., the defendants argued that Bowden failed to establish the four elements of the intentional infliction of emotional distress cause of action. Specifically, the defendants focused on the severity of distress element and asserted that "the Plaintiff failed to establish the type of severe emotional distress necessary to establish a prima facie case of intentional infliction...." Bowden's only response was that "I can't think of anything that ... could [be] ... as severe as the basic personality of a person being changed." The circuit court disagreed with Bowden and granted the defendants' motion for J.N.W.V. on this count. The circuit court found that "from the circumstances here ... the emotional distress that was suffered, ... was not the kind that the Court of Appeals contemplates to meet the standards of this tort." We agree.[2]

*Harris* focused on the same issue as the case at bar. There we said that the fourth element of the tort "requires the plaintiff to show that he suffered a *severely* disabling emotional response to the defendant's conduct. The severity of the emotional distress is not only relevant to the amount of recovery, but is a necessary element to any recovery." *Harris*, 281 Md. at 570, 380 A.2d at 616 (emphasis in original). For emotional distress to be severe, it must be so acute that " 'no reasonable man could be expected to endure it.' " *Id.* at 571, 380 A.2d at 616 (quoting *Restate-*

---

2. We only address the requirement of severe emotional distress. We do not address whether Bowden adequately proved the other three requirements of this tort.

*ment (Second) of Torts* § 46 cmt. j (1965)). We measure such severity by the intensity of the response as well as its duration. *Id.*

Although there is no clearly defined bright-line test for severe emotional distress, the trial judge did not err in concluding that there was legally insufficient evidence at trial from which a jury could properly have concluded that Bowden suffered the sort of emotional harm required in *Harris* and our subsequent line of cases. Bowden may have been "upset," "embarrassed," and "confused," and may have "felt bad about himself"; and this type of emotional distress may have been uncomfortable. None of these effects, however, indicate that Bowden had the severely disabling emotional response that hindered his ability to carry out his daily activities or the severe emotional distress this cause of action requires. *Compare Harris,* 281 Md. at 572, 380 A.2d at 617 (holding that evidence of aggravation of plaintiff's pre-existing nervous and speech condition was vague and did not establish severity element) *and Moniodis v. Cook,* 64 Md.App. 1, 15–16, 494 A.2d 212, 219, *cert. denied,* 304 Md. 631, 500 A.2d 649 (1985) (plaintiffs' testimony that they were upset, increased smoking, lost sleep, and experienced hives failed to present legally sufficient evidence to establish severe emotional distress) *with Figueiredo–Torres,* 321 Md. at 656, 584 A.2d at 76 (allegations in complaint that plaintiff experienced systemic hypertension, loss of visual acuity, and required psychiatric hospitalization were sufficient to survive defendant's motion for summary judgment) *and B.N. v. K.K.,* 312 Md. 135, 144–45, 538 A.2d 1175, 1180 (1988) (finding that the emotional distress caused by the transmission of herpes, including the fact that the plaintiff felt extremely distressed by the limitations on her normal sexual activity, marriage prospects, and childbearing, fulfilled requirement of severe emotional injury). As we noted in *Harris,* the phrase "emotional distress" might conceivably include

" 'all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger,

chagrin, disappointment, worry, and nausea. It is only where it is *extreme* that the liability arises....' " (Emphasis added).

*Harris*, 281 Md. at 570–71, 380 A.2d at 616 (quoting *Restatement (Second) of Torts* § 46 cmt. j (1965)). The evidence may have shown that Bowden was distressed, but it failed to establish the level of severe or extreme emotional injury that is needed to trigger liability for this tort. Not only did Bowden continue his normal activities, but he did not seek psychological assistance until his single visit on the eve of litigation. Bowden presented no expert testimony as to any emotional distress and his own description of his discomfort was insufficient to establish severe emotional distress. As a result, we affirm the circuit court's grant of J.N.W.V. on the count of intentional infliction of emotional distress.

### B. Wrongful Discharge

 The parties also dispute whether the circuit court was correct in granting J.N.W.V. with respect to Bowden's wrongful discharge claim. Maryland follows the common law rule that generally an at-will employment relationship can be legally terminated at the pleasure of either party at any time. *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981); *State Comm'n on Human Relations v. Amecon Div.*, 278 Md. 120, 126, 360 A.2d 1, 5 (1976); *see generally* Annotation, *Modern Status of Rule That Employer May Discharge At–Will Employee for Any Reason*, 12 A.L.R.4th 544 (1982). The common law rule may be abrogated, however, by express legislative enactments regulating the terms of employment or by judicial exception. *Adler*, 291 Md. at 35, 42–43, 432 A.2d at 467, 471; *see Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 609–10, 561 A.2d 179, 182 (1989). In instances where neither legislative nor judicial exceptions apply, the common law rule controls.

In response to the defendants' motion for J.N.W.V., the circuit court stated that Bowden failed to provide a "specific

public policy here other than what's covered by other torts such as false imprisonment and defamation." On appeal Bowden asserted that a clear public policy existed in this case to support his cause of action for wrongful discharge. According to Bowden an employee has a fundamental right to be free from coercion; Bowden therefore reasons it is contrary to public policy for an employer to coerce a statement from an employee and then use that statement, together with the belief that the employee stole money and property, as a grounds for discharge. In response, the defendants argue that Bowden was terminated for security reasons, and that Bowden failed to reveal any improper motive underlying his discharge.

In *Adler v. American Standard Corp.*, this Court for the first time recognized a judicial exception to the common law at-will employee rule. There we adopted "a cause of action for abusive discharge by an employer of an at will employee when the *motivation* for the discharge contravenes some clear mandate of public policy...." *Adler*, 291 Md. at 47, 432 A.2d at 473 (emphasis added). Implicit in our recognition of this cause of action is a reservation of an employer's right to discharge an at-will employee where the motivation for the discharge is not impermissibly tainted.[3]

The evidence in this case shows the defendants treated Bowden in a harsh and reprehensible manner. The evidence, even in a light most favorable to Bowden, however, does not show the defendants were driven by an improper

---

3. To date this Court has recognized several important public policies whose violation may give rise to a cause of action for wrongful discharge. *See Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 467, 480–81, 588 A.2d 760, 766 (1991) ("[I]t is contrary to a clear mandate of public policy to discharge an employee for seeking legal redress against a co-worker for workplace sexual harassment culminating in assault and battery."); *Ewing v. Koppers Co.*, 312 Md. 45, 50, 537 A.2d 1173, 1175 (1988) ("Discharging an employee solely because that employee filed a worker's compensation claim contravenes the clear mandate of Maryland public policy."); *cf. Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 610–11, 561 A.2d 179, 182 (1989) (listing three categories where other states' courts have typically applied wrongful discharge cause of action).

motive when they discharged Bowden. At most, the evidence indicates that Bowden was discharged because he was suspected of store theft. The fact that the defendants used improper means to attempt to confirm their suspicions of Bowden's theft of money and property does not mean they are liable for wrongful discharge because they discharged him based on those mere suspicions. In fact, when faced with a motion for judgment at the end of his case-in-chief, Bowden did not identify any facts that indicated the existence of an improper motive for his termination. Bowden merely stated that the defendants' act of taking the coerced statement and using it as a basis for his discharge was a violation of public policy. That act may have been improper but, nevertheless, it is clear from the record that the reason for Bowden's discharge was the defendants' suspicion that Bowden stole money and merchandise. While such a suspicion may have been misplaced and Bowden's termination based on a factually incorrect premise, the defendants' mere suspicion of theft can serve as the basis for discharging an at-will employee. We therefore affirm the circuit court's grant of J.N.W.V. for the count of wrongful discharge.

## C. Defamation

The defendants also contend that the circuit court erred in refusing to grant J.N.W.V. on the defamation count. They argue that the verdict must have been based on their communications with the Baltimore County police and that their communications were entitled to an absolute privilege and thus could not be a basis for a defamation suit. According to Bowden, the accusation of theft made to law enforcement officers was only entitled to a conditional privilege, a privilege that was negated upon the jury's finding that the defendants acted with malice. *See Marchesi v. Franchino*, 283 Md. 131, 139, 387 A.2d 1129, 1133 (1978) (describing standard of malice necessary to defeat conditional privilege). Further, Bowden contends that the defendants committed defamatory acts other than their

statements to the police. Addressing first the defamatory statements made to the police, we decline to extend an absolute privilege to defamatory communications volunteered to police prior to the commencement of any official investigation.

Maryland has long recognized the existence of an absolute privilege for defamatory utterances made during the course of judicial proceedings or contained in documents directly related to such proceedings. *Odyniec v. Schneider*, 322 Md. 520, 526–27, 588 A.2d 786, 789 (1991); *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 403–04, 494 A.2d 200, 203 (1985) (citing *Hunckel v. Voneiff*, 69 Md. 179, 14 A. 500 (1888) and *Bartlett v. Christhilf*, 69 Md. 219, 14 A. 518 (1888)). This privilege protects the judge, the witnesses, the parties, and, to a more limited degree, the attorneys involved in the judicial proceeding in which the defamatory statement occurs. *Keys*, 303 Md. at 404, 494 A.2d at 203; *Odyniec*, 322 Md. at 526, 588 A.2d at 789. Where the absolute privilege applies, it protects persons publishing the defamatory statement from liability even where their motives are malicious and made with the knowledge of the statement's falsity. *Odyniec*, 322 Md. at 527, 588 A.2d at 789.

In *Adams v. Peck*, 288 Md. 1, 415 A.2d 292 (1980), we extended the scope of the absolute privilege for judicial proceedings to include documents related to pending judicial proceedings *regardless* of whether they had actually been filed in those proceedings. In *Adams*, two parents were involved in a contested divorce proceeding. The parents entered into a separation agreement which granted the mother custody and the father visitation rights. Several months later, while the divorce litigation was pending, the mother sought to have the father's visitation rights modified. In connection with this attempt, the mother's attorney referred the mother and children to a psychiatrist for an evaluation. The psychiatrist sent a written report to the mother's attorney which accused the father of abusing one of the children. On the basis of the report, the mother filed

a Petition for Modification of Visitation Rights. Although the mother did not file the report in the pending divorce proceedings, the father apparently obtained a copy and sued the psychiatrist for defaming him in the report. We held that the report was entitled to an absolute privilege despite the fact that it was not actually filed in the proceedings. *Id.* at 8–9, 415 A.2d at 296. We said:

> "[t]he question whether a defamatory statement should be absolutely privileged involves a matter of public policy in which the public interest in free disclosure must be weighed against the harm to individuals who may be defamed. *See Maurice v. Worden*, 54 Md. 233, 253 (1880). The underlying rationale for according an absolute privilege to the defamatory statements made in court by participants in judicial proceedings or to such statements published in documents which have been filed is that such a privilege is necessary to the proper administration of justice. The ultimate purpose of the judicial process is to determine the truth. The investigation, evaluation, presentation and determination of facts are inherent and essential parts of this process. If this process is to function effectively, those who participate must be able to do so without being hampered by the fear of private suits for defamation.
>
> \* \* \* \* \* \*
>
> These public policy reasons are equally applicable to defamatory statements published in documents which are prepared for possible use in connection with a pending judicial proceeding but which have not been filed.
>
> \* \* \* \* \* \*
>
> The people who engage in these activities and who generate such documents must be able to do so without being hampered by the fear of private suits for defamation."

*Id.* at 5–6, 8, 415 A.2d at 294–95. In *Adams*, the report was requested by an attorney representing a client in an active domestic case and was therefore absolutely privileged be-

cause it "was published *during* the course of that judicial proceeding." *Id.* at 8, 415 A.2d at 296 (emphasis added).

*Adams* did not address in any detail the question of what constitutes a "judicial proceeding" for purposes of the absolute privilege, probably because in that case the answer was an easy one—there was divorce litigation pending in the courts. The defendants in this case ask us to extend the judicial proceedings privilege to cover their communications with Baltimore County police. We do not believe, however, that the privilege should be extended so far.

In addressing the meaning of "judicial proceedings" for purposes of granting an absolute privilege we have, for example, refused to extend the privilege to statements made at some administrative hearings. In *Gersh v. Ambrose*, 291 Md. 188, 434 A.2d 547 (1981), the plaintiff alleged that the defendant, while testifying at a public hearing before the Baltimore City Community Relations Commission, had slanderously accused him of having committed certain criminal offenses. The defendant claimed he was entitled to absolute immunity as a witness called to testify before the Commission. We refused to grant an absolute privilege for his testimony, noting that

"[m]ost American courts which have extended absolute immunity to witnesses testifying in other than strictly judicial, in-court settings have first assured themselves that in such settings there are sufficient judicial safeguards so as to minimize the likelihood of harm to potentially defamed (or otherwise injured) individuals who would have no legal remedy."

*Id.* at 192, 434 A.2d at 549. Applying this principle to the facts in *Gersh,* we observed that the Commission's hearing, really no more than an "open public meeting," lacked the procedural safeguards traditionally provided in judicial proceedings. We found that "[t]he public benefit to be derived from testimony at Commission hearings of this type is not sufficiently compelling to outweigh the possible damages to individual reputations to warrant absolute witness immuni-

ty." *Id.* at 196, 434 A.2d at 551; *see also McDermott v. Hughley,* 317 Md. 12, 26, 561 A.2d 1038, 1045 (1989) ("administrative investigation" was not sufficiently protective to warrant absolute privilege).

Distinguishing judicial proceedings from some administrative hearings because of procedural safeguards in the former is one basis for drawing a line between granting and denying the absolute privilege. Another way of drawing the same line is by examining at what stage of the legal process the defamatory communication is made. The communications in the instant case were made to the police and not, for example, to a prosecuting attorney or magistrate. Although we have never addressed the issue directly, in *Miner v. Novotny,* 304 Md. 164, 498 A.2d 269 (1985), we noted that Professors Prosser and Keeton have suggested that

> " 'an informal complaint to a prosecuting attorney or a magistrate is to be regarded as an initial step in a judicial proceeding, and so entitled to an absolute, rather than a qualified immunity.' "

*Id.* at 171, 498 A.2d at 272 (quoting W.P. Keeton, et al., *Prosser & Keeton on Torts* § 114, at 819–20 (5th ed. 1984)). This Court has also extended the absolute privilege to complaints to police in one very distinct situation. In *Miner,* 304 Md. at 177, 498 A.2d at 275, we extended an absolute privilege to citizen complaints of police brutality made under oath, which initiated administrative disciplinary proceedings. In weighing the need for extending the absolute judicial proceedings privilege to this limited area we said:

> "Our society vests its law-enforcement officers with formidable power, the abuse of which is often extremely detrimental to the public interest. Citizen complaints of such abuses, and the administrative disciplinary procedure which has been developed to investigate these complaints, serve a public function of vital importance by providing a mechanism through which abuses may be

reported to the proper authorities, and the abusers held accountable."

*Id.* at 176, 498 A.2d at 274–75. We recognized the potential harm a false brutality complaint may cause to a law enforcement officer's reputation, but concluded that it is "outweighed by the public's interest in encouraging the filing and investigation of valid complaints." *Id.* at 176, 498 A.2d at 275.

*Miner* is easily distinguishable from the instant case. *Miner* conferred an absolute privilege for a sworn complaint which initiated law enforcement disciplinary proceedings. Those proceedings had sufficient procedural safeguards to make the judicial proceeding privilege applicable. The complaint in *Miner* was the formal means of initiating the proceedings and was analogous to the complaint which initiates a judicial proceeding. Further, law enforcement officers have some protections because the complaint must be under oath, and if the officer is exonerated, any record of the complaint may be expunged. Maryland Code (1957, 1992 Repl.Vol.), Article 27, § 728(b)(12)(ii). The public policy reasons for extending the absolute judicial proceedings privilege to the sworn complaint in *Miner* are far less compelling when applied to the oral accusation volunteered to the police by the defendants in the instant case. As we said in *Adams*, "[t]he question whether a defamatory statement should be absolutely privileged involves a matter of public policy in which the public interest in free disclosure must be weighed against the harm to individuals who may be defamed." *Adams*, 288 Md. at 5, 415 A.2d at 294. We do not believe public policy is violated by requiring that citizens who report criminal activities to the police do so in good faith. Those who maliciously volunteer false accusations of criminal activity to the police should not be granted absolute immunity. Although we do not wish to discourage the reporting of criminal activity, we also do not wish to encourage harassment, or wasting of law enforcement resources, by investigations of false, maliciously made complaints. As the Supreme Court of Florida recently stated

"a qualified privilege 'is sufficiently protective of [those] wishing to report events concerning crime and balances society's interest in detecting and prosecuting crime with a defendant's interest not to be falsely accused.' There is no benefit to society or the administration of justice in protecting those who make intentionally false and malicious defamatory statements to the police. The countervailing harm caused by the malicious destruction of another's reputation by false accusation can have irreparable consequences. We believe the law should provide a remedy in situations such as this."

*Fridovich v. Fridovich,* 598 So.2d 65, 69 (Fla.1992) (quoting *Fridovich v. Fridovich,* 573 So.2d 65, 70 (Fla.App. 4th Dist.1990)). Accordingly, we see no compelling public policy reason to extend to these defendants the absolute judicial proceedings privilege which, for good reason, protects even "the evil disposed and malignant slanderer." *Bartlett v. Christhilf,* 69 Md. 219, 226, 14 A. 518, 520 (1888).

We note that a number of other courts apply only a qualified privilege to communications made to police for the purpose of reporting criminal activity. *See Fridovich,* 598 So.2d at 67–69 (citing states that have adopted qualified privilege and holding that defamatory statements voluntarily made by private individuals to the police are qualifiedly privileged); *Packard v. Central Maine Power Co.,* 477 A.2d 264, 268 (Me.1984) (finding trial court properly instructed jury that statements made to sheriff's department "for purpose of aiding in the detection of crime" were entitled to qualified privilege); *Davenport v. Armstead,* 255 S.W.2d 132, 134–36 (Mo.App.1952) (court applied qualified privilege, and not absolute privilege, to reports of criminal activity made to police officers); *Dijkstra v. Westerink,* 168 N.J.Super. 128, 401 A.2d 1118, 1121, *cert. denied,* 81 N.J. 329, 407 A.2d 1203 (1979) (refusing to apply absolute privilege, and instead applying conditional privilege to accusations to police of criminal activity); *Bergman v. Hupy,* 64 Wis.2d 747, 221 N.W.2d 898, 900–01 (1974) (distinguishing between qualified privilege for statements to police and absolute privi-

lege for statements to grand jury or prosecutor); *see also Hardaway v. Sherman Enter., Inc.,* 133 Ga.App. 181, 210 S.E.2d 363, 364 (1974), *cert. denied,* 421 U.S. 1003, 95 S.Ct. 2405, 44 L.Ed.2d 672 (1975) (applying conditional privilege for statements to police); *Indiana Nat'l Bank v. Chapman,* 482 N.E.2d 474, 479–80 (Ind.Ct.App.1985) (recognizing that qualified privilege applies to statements made to police); *Toker v. Pollak,* 44 N.Y.2d 211, 405 N.Y.S.2d 1, 376 N.E.2d 163, 167 (1978) ("a policeman is not a judicial officer" for purposes of absolute judicial privilege); *Sylvester v. D'Ambra,* 73 R.I. 203, 54 A.2d 418, 420 (1947). We recognize that other courts have held that some defamatory statements to police are absolutely privileged. *See McGranahan v. Dahar,* 119 N.H. 758, 408 A.2d 121, 127–28 (1979) (statements made during course of criminal investigation to police, city attorney, and prosecutor before criminal case began were sufficiently connected with subsequent judicial proceeding to be absolutely privileged); *Starnes v. International Harvester Co.,* 184 Ill.App.3d 199, 132 Ill.Dec. 566, 568–69, 539 N.E.2d 1372, 1374–75, *appeal denied,* 127 Ill.2d 642, 136 Ill.Dec. 607, 545 N.E.2d 131 (1989) (applying absolute immunity to statements made before beginning of trial when made to police or prosecutors); *Correllas v. Viveiros,* 410 Mass. 314, 572 N.E.2d 7, 11 (1991) (statements made to police during investigation of crime were absolutely privileged where the police investigation was not initiated by the defendant). In light of our discussion above, we hold that communications made to the police, at least those made prior to any official investigation, are not entitled to the judicial proceedings privilege and therefore do not receive absolute immunity.

█ We need not even address whether these statements to the police are entitled to a qualified privilege, but we will assume they are. The jury determined that the defendants defamed Bowden and that they acted with malice in doing so, thereby negating any qualified privilege that might have existed. *See Marchesi,* 283 Md. at 139, 387 A.2d at 1133. Likewise, the jury's finding of malice also negated any

conditional privilege that Caldor could claim as arising out of the employer-employee relationship. *See McDermott,* 317 Md. at 28, 561 A.2d at 1046 ("communications arising out of the employer-employee relationship clearly enjoy a conditional privilege"); *Kairys v. Douglas Stereo Inc.,* 83 Md.App. 667, 679–80, 577 A.2d 386, 391 (1990) (communications arising out of employer-employee relationship, including statements accusing employees of theft, are subject to qualified privilege); *see also General Motors v. Piskor,* 277 Md. 165, 172–74, 352 A.2d 810, 816 (1976), *appealed after remand,* 281 Md. 627, 381 A.2d 16 (1977).

■ We also agree with Bowden that there was clear evidence on which the jury could have based its finding of defamation in addition to the statements made by the defendants to the police. As Bowden noted in his brief, "leading Samuel Bowden throughout the entire store in handcuffs would lead any reasonable observer to conclude that Samuel had in fact committed an unlawful act." Bowden testified that the defendants paraded him in handcuffs through the store in full view of customers and other employees with whom he worked. This conduct alone constituted actionable defamation, and could have been "found by the jury to contain an imputation of theft." *See Piskor,* 277 Md. at 174, 352 A.2d at 816 (confronting employee in glass-enclosed office, in full view of many other employees, could have been found an abuse of qualified privilege if confrontation contained an "imputation of theft"). We have long recognized that defamatory statements may be published through actions as well as through written or spoken word. *M & S Furniture Sales Co. v. DeBartolo Corp.,* 249 Md. 540, 544, 241 A.2d 126, 128 (1968).

## D. Malicious Prosecution

■ The defendants' next assignment of error focuses on the circuit court's denial of their J.N.W.V. motion on the malicious prosecution count. "[T]he principles governing a suit for malicious prosecution ... are generally well-settled." *Exxon Corp. v. Kelly,* 281 Md. 689, 693, 381 A.2d

1146, 1149 (1978). To establish a cause of action for malicious prosecution, a plaintiff must prove that there was:

"(a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) 'malice,' or a primary purpose in instituting the proceeding other than that of bringing an offender to justice."

*Id.* (quoting *Durante v. Braun*, 263 Md. 685, 688, 284 A.2d 241, 243 (1971) quoting *Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 173, 122 A.2d 457, 460 (1956)).

The defendants allege that the circuit court erred in several ways. They first argue that the circuit court impermissibly allowed Bowden to re-litigate the issue of probable cause, which they claim Master Gilbert decided in the juvenile proceeding. According to the defendants, Master Gilbert implicitly decided that there was probable cause for the proceeding when he denied Bowden's motion for judgment at the end of the State's case-in-chief. The defendants assert that Master Gilbert's implicit finding of probable cause should be given effect through the doctrine of collateral estoppel, precluding any further litigation of the issue of probable cause. Accordingly, the defendants assert Bowden was collaterally estopped from proving the third element of the malicious prosecution claim—lack of probable cause.

This Court has adopted a four-part test which must be satisfied in order for the doctrine of collateral estoppel to be applicable:

"1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?

2. Was there a final judgment on the merits?

3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?"

*Washington Suburban Sanitary Comm'n v. TKU Assocs.*, 281 Md. 1, 18–19, 376 A.2d 505, 514 (1977) (citing *Pat Perusse Realty Co. v. Lingo*, 249 Md. 33, 45, 238 A.2d 100, 107 (1968)).

■ In finding that collateral estoppel was inapplicable, the trial court explained that

"[b]asically, there [are] three unities that must be met in order for collateral estoppel to occur: the unities of the parties, the unities of the issues, and a final judgment. In this particular case, there is not a unity of the parties. The other party was State of Maryland in re [Bowden] ... [w]hereas, here it's Bowden versus Caldor and three individuals, and ... I guess the issue is the same. So due to the lack of unity of the parties, I don't think that collateral estoppel is an issue here."

The defendants assert that the trial court erred by requiring the "unities of the parties" before invoking collateral estoppel. The defendants are correct in this respect. This Court long ago discarded the traditional requirement of strict mutuality of parties in the context of res judicata and collateral estoppel in civil cases. *MPC, Inc. v. Kenny*, 279 Md. 29, 34–35, 367 A.2d 486, 490–91 (1977); *Pat Perusse Realty Co. v. Lingo*, 249 Md. 33, 45, 238 A.2d 100, 107 (1968). The appropriate focus is whether the parties against whom collateral estoppel is asserted "have been afforded their day in court on those facts and issues." *Kenny*, 279 Md. at 35, 367 A.2d at 490; *Pat Perusse Realty*, 249 Md. at 45, 238 A.2d at 107. Thus, it is irrelevant that the party seeking to assert collateral estoppel was not a party to the prior proceeding. Only the party against whom collateral estoppel is asserted need be a party or in privity with a party in the prior adjudication. *Kenny*, 279 Md. at 35–36, 367 A.2d at 491; *Pat Perusse Realty*, 249 Md. at 45, 238 A.2d at 107. The trial court thus erred in

applying the "unity of the parties" standard to the defendants' collateral estoppel defense.

 Although the circuit court misapplied the mutuality of parties requirement, in this instance it was harmless because the defendants still have not established all the required elements of collateral estoppel. We first note, without deciding the issue, that the findings of fact and rulings of law made by the master in the juvenile proceeding may not be entitled to the preclusive effects of collateral estoppel since the juvenile proceedings before Master Gilbert did not result in a final judgment on the merits. Maryland Rule 911 governs the use of judicial masters in juvenile cases and specifically provides that "[t]he findings, conclusions and recommendations of a master do not constitute orders or final action of the court." Maryland Rule 911 a.2. In addition, although Rule 911 d allows a court to adopt a master's proposed findings if the parties do not take exception to those findings, a court's adoption of the proposed findings is not mandated. Instead, Rule 911 d simply states that under the appropriate circumstances "the master's proposed findings of fact, conclusions of law and recommendations *may* be adopted...." (Emphasis added). Although Master Gilbert's findings may have been adequate to end the juvenile proceedings against Bowden, absent proof of the court's decision to adopt these recommended findings of law and fact as its final judgment, the Master's recommendations under Rule 911 might not constitute a "final judgment on the merits" for purposes of collateral estoppel.

Even if Master Gilbert's decision had constituted a final judgment, there was no final judgment which specifically established that the defendants had probable cause to initiate the juvenile court action against Bowden. The defendants rely on the fact that Master Gilbert denied Bowden's motion for judgment at the end of the State's case-in-chief. Mere denial of a motion for judgment at the end of the State's case is not necessarily a finding that the defendants had probable cause to initiate the proceedings. Denial of

Bowden's motion for judgment simply meant that assuming Bowden's "confession" was true, and assuming Caldor's employees who testified at the juvenile proceeding testified truthfully and accurately, then the State had made out a prima facie case of theft. When Master Gilbert made his ruling, Bowden had been afforded no opportunity to present his own evidence or to dispute the State's allegations and the accuracy of the confession. The juvenile Master's denial of the motion for judgment did not collaterally estop Bowden from later proving defendants lacked probable cause. *Cf. Davis v. Quille*, 248 Md. 631, 634–35, 237 A.2d 745, 747 (1968) (holding that municipal court judge's decision at preliminary hearing holding accused for action of grand jury may constitute some evidence, but not conclusive proof, of probable cause in a subsequent malicious prosecution suit).

 The defendants also claim that the master's refusal to grant Bowden's motion to suppress his confession conclusively established that the confession was voluntary and collaterally estopped Bowden from denying probable cause. The short answer to this contention is that denial of a motion to suppress is a prima facie determination, but does not conclusively establish that a confession is voluntary. That decision must be made by the trier of fact at the end of the entire case. *See Brittingham v. State*, 306 Md. 654, 665–66, 511 A.2d 45, 50–51 (1986).

Finally, with respect to the malicious prosecution count, the defendants offer an alternative to their collateral estoppel argument. They assert that a juvenile proceeding arising out of a criminal charge of theft does not constitute a "criminal proceeding" under the first element of the malicious prosecution cause of action. The defendants reason that, since a juvenile proceeding under the Maryland Code does not constitute a criminal conviction, Md.Code (1974, 1989 Repl.Vol.), Courts & Judicial Proceedings Article, § 3-824(a)(1), such a proceeding cannot constitute a "criminal prosecution." Accordingly, the defendants assert that Bow-

den failed to establish a prima facie case of malicious prosecution. We need not decide whether this contention has any merit. As the defendants conceded at oral argument, they failed to raise this issue at the circuit court and, thereby, failed to preserve it for our review.

### E. False Imprisonment

Finally, the defendants challenge the circuit court's denial of J.N.W.V. on the count of false imprisonment. The defendants argue that probable cause is an affirmative defense to an action for false imprisonment and that this issue was previously decided in the juvenile proceedings before Master Gilbert. *See* Md.Code (1974, 1989 Repl.Vol.), Courts & Judicial Proceedings Art., § 5–307 (creating statutory defense of probable cause for merchants in false arrest, slander, and malicious prosecution actions). As we have already noted, Master Gilbert's findings were not a final determination that the defendants had probable cause. Therefore, we affirm the circuit court's denial of J.N.W.V. on the false imprisonment count.

### III.

The final issue the defendants have raised is whether the circuit court erred in denying the defendants' motion for new trial on the issue of punitive damages after granting J.N.W.V. on two of the five underlying tort actions. We believe the judge erred in this ruling.

In the instant case, the jury awarded Bowden compensatory damages against all defendants on all five tort theories. At a separate proceeding, the same jury heard arguments concerning the amount of punitive damages to be awarded. The jury then determined the amount of punitive damages that should be assessed against each of the individual defendants, although the punitive damages award did not allocate the punitive damages among the tort counts. Later, the circuit court granted J.N.W.V. on the counts of wrongful discharge and intentional infliction of emotional distress, but left intact the punitive damages

award, despite indications on the jury verdict sheet that the jury may have based the punitive damages award, in part, on the two stricken counts.

 Punitive or exemplary damages operate to punish the wrongdoer and to deter such conduct by the wrongdoer or others in the future. *See* Dan B. Dobbs, *Remedies* § 3.9, at 205 (1973). There are two threshold conditions that parties must meet before being entitled to receive an award of punitive damages. *See Rite Aid Corp. v. Lake Shore Investors*, 298 Md. 611, 626–27, 471 A.2d 735, 743 (1984). The first condition is that there be a compensatory damages award underlying an award of punitive damages. *Id.* at 626, 471 A.2d at 743; *Montgomery Ward & Co. v. Keulemans*, 275 Md. 441, 446, 340 A.2d 705, 708 (1975); *Shell Oil Co. v. Parker*, 265 Md. 631, 644, 291 A.2d 64, 71 (1972). The second condition required to support punitive damages is that the tort be committed with malice. *Owens–Illinois v. Zenobia*, 325 Md. 420, 450–63, 601 A.2d 633, 647–54, *reh'g denied*, 325 Md. 665, 602 A.2d 1182 (1992); *Rite Aid*, 298 Md. at 627, 471 A.2d at 743. The question before us concerns only the first condition.

The issue in the instant case involves the nature of the compensatory damages foundation required to support a consolidated award of punitive damages. The defendants contend that an award of punitive damages must rest upon a foundation of compensatory damages for each count that the jury may have relied upon in awarding punitive damages. Bowden disagrees and asserts that *any* award of compensatory damages for a given course of conduct is a sufficient foundation for a punitive damages award. He asserts that it is the existence of the conduct alone and not the categories of legal wrong that is significant. Because punitive damages punish conduct, Bowden argues, they should not be tied to particular theories of recovery. Bowden proposes that the proper focus is on the defendants' course of conduct, and thus an award of compensatory damages on even one of the counts in a multiple count

judgment provides an adequate foundation for punitive damages. We reject this argument.

Our prior decisions indicate that there must be a compensatory damages award foundation for *each* count of a complaint that provides a basis for punitive damages. This issue was before the Court in *Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 340 A.2d 705 (1975). In *Keulemans,* the plaintiff Keulemans sued Montgomery Ward and several individual defendants for false imprisonment, defamation, and malicious prosecution. The jury had awarded Keulemans compensatory damages for false arrest and punitive damages for malicious prosecution without a compensatory damages award for malicious prosecution. The issue before the Court was whether the award of punitive damages should be stricken. We noted that "the rule of our cases is clear that there must be an award of compensatory damages ... for an award of punitive damages to be allowed to stand." *Id.* at 446, 340 A.2d at 708 (citations omitted). There, however, we declined to strike the punitive damages award. Instead, we were able to remand with instructions to reform the jury's verdict because the record from the trial clearly indicated an error on the verdict sheet. We determined that the jury actually intended that a portion of compensatory damages in the amount of $350.00 in attorneys fees in defending the criminal charges were awarded for malicious prosecution and not for false imprisonment. *Id.* at 447, 340 A.2d at 708–09. Thus, after the reformation of the verdict there was an actual compensatory award for the count of malicious prosecution to support an award of punitive damages on that same count.

Several of our more recent cases also indicate that there must be an award of compensatory damages for each count which forms the foundation for an award of punitive damages. In fact, we need only refer to *Batson v. Shiflett,* 325 Md. 684, 602 A.2d 1191 (1992), which this Court decided last term. In *Batson,* the plaintiff Shiflett sued the defendant Batson under two distinct torts, defamation and intentional infliction of emotional distress. At the close of the trial, the

jury awarded Shiflett $610,000 in compensatory damages and a total of $120,000 in punitive damages, but did not apportion the award between the defendants' liabilities for defamation and intentional infliction of emotional distress. *Id.* at 698, 602 A.2d at 1198. On appeal, this Court reversed the judgment for the tort of intentional infliction of emotional distress. We then remanded the case to the circuit court to recalculate both punitive and compensatory damages. We held that because the award did not itself apportion the damages between the distinct torts of defamation and intentional infliction of emotional distress, and since it was impossible for us to determine what part of the damages award was attributable to each tort, the damages award had to be vacated and the case remanded for a new trial on both compensatory and punitive damages. *Id.* at 737–38, 602 A.2d at 1218.

*Batson* is consistent with our case of *Palmer Ford, Inc. v. Wood,* 298 Md. 484, 471 A.2d 297 (1984). In *Palmer Ford,* the jury awarded both compensatory and punitive damages, but did not allocate them between the two counts alleged. *Id.* at 493, 471 A.2d at 301. The trial judge denied the defendant's motion for J.N.W.V. on both counts. On appeal, we held that the trial judge should have granted J.N.W.V. on one count, and we remanded for a redetermination of damages on the remaining count. *Id.* at 514, 471 A.2d at 312.

As noted above, one of the purposes of punitive damages is to punish the wrongs of the defendant. The requirement of a compensatory damages foundation protects defendants from being punished for acts that the trial court determines the defendant did not commit. In assessing punitive damages, a jury might have been influenced by the number of distinct civil wrongs the defendants committed. In light of this concern and the clear weight of authority cited above, the award of punitive damages must be vacated and a new trial ordered for the sole purpose of calculating punitive damages based on the three remaining torts of false imprisonment, defamation, and malicious prosecution.

Caldor also contends that the amount of punitive damages that the jury awarded in the instant case has no understandable ratio to the compensatory damages awarded, citing *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). As we are remanding the case for a new determination of punitive damages, we need not reach this issue.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE-HALF BY THE APPELLANT AND ONE-HALF BY THE APPELLEE.*

ELDRIDGE, Judge, dissenting:

I disagree with the majority's affirmance of the circuit court's decision to overturn the jury verdicts finding intentional infliction of emotional distress and abusive discharge. The jury could reasonably conclude that the conduct of the defendants in the case, toward the minor plaintiff and his mother, was extreme and outrageous. The egregious conduct, and its consequences, fully justified the jury's award of damages for both intentional infliction of emotional distress and abusive discharge.

I.

As the majority indicates, in reviewing a trial court's decision to grant a motion for judgment at the close of the evidence or a motion for judgment notwithstanding the verdict, an appellate court must view the evidence in the light most favorable to the non-moving party. Moreover, in such a case, it is not only the evidence which must be viewed most favorably to the non-moving party but, in addition, all "inferences" must be considered "in the light most favorable to the party against whom the motion is made." Maryland Rule 2–519(b). *See, e.g., Metromedia v. WCBM Maryland*, 327 Md. 514, 518, 610 A.2d 791, 793

(1992); *Allstate Ins. v. Miller*, 315 Md. 182, 186, 553 A.2d 1268, 1270 (1989); *Snyder v. Glusing*, 307 Md. 548, 515 A.2d 767 (1986); *Impala Platinum v. Impala Sales*, 283 Md. 296, 327, 389 A.2d 887, 905–906 (1978); *Gill v. Computer Equip. Corp.*, 266 Md. 170, 173, 292 A.2d 54, 55 (1972). The majority in the present case, however, chooses to draw certain inferences of its own from the evidence, whereas the jury reasonably could have drawn entirely different inferences.

Considering the evidence and legitimate inferences therefrom in a light most favorable to the plaintiff in this case, the jury was entitled to find the following. Samuel Bowden, a sixteen year old African–American high school student, obtained a part-time evening job with Caldor, a discount department store, as a "customer service representative." One evening, using a pretext to get Samuel to accompany her, his supervisor took him to a small, windowless room, measuring approximately ten feet square. Two men, who were employed by Caldor as security personnel, kept Samuel imprisoned in this windowless room by blocking the door. They threatened him physically and verbally when he tried to leave. They used vulgar language and threatened him again when he tried to telephone for help. When Samuel indicated to the men that his mother would worry and try to contact him, they told Samuel that they would lie to her and tell her that Samuel was not in the store. Of course, this lie would compound her worry at not being able to reach Samuel, which further distressed him. In addition, this statement scared Samuel because it indicated that no one except his captors would know where he was.

The men began making a series of false accusations against Samuel, telling him that he was suspected of theft. Ignoring his denials, they falsely told him that they had a videotape of him stealing. The men forced Samuel to show them the contents of his pockets and wallet. The two security employees kept Samuel prisoner for over four hours, telling him that he would not be able to leave until he

confessed to the "theft."[1] Finally, after over four hours, exhausted and frightened, he signed the false confession dictated to him by the security personnel. The men told Samuel that he would have to make restitution. They told him to empty his bank account, obtain a money order payable to Caldor, and bring it back to them by 9:00 the next morning, all without involving his parents. If he failed to obey these orders, the men told Samuel, they would call the police and use his "confession" to charge him with theft.

When Samuel returned home, his mother asked him why he was so late. Earlier, she had called the store and had been told that he was not there. Samuel related the entire incident to his mother. The next day, Samuel's mother took him back to the store to inquire about what had happened the previous evening. Mrs. Bowden spoke with Mehan and Forrester, both managers at the store. Forrester subjected Mrs. Bowden and Samuel to abusive racial epithets which implied that Samuel was being persecuted because of his skin color. Forrester stated: "You people—you nigger boys make me sick, but you're going to burn for this, you sucker." Mehan indicated his agreement with Forrester's attitude.

When Samuel and Mrs. Bowden tried to leave, Mehan seized Samuel and forced him to walk through the store to the manager's office. Mehan refused to show them the alleged videotapes. Mehan handcuffed Samuel and made him march through the store, in the handcuffs, in full public view. As the majority points out, "he remained in handcuffs in public view until the police arrived." When the police officers arrived, they transferred Samuel from Mehan's handcuffs to their own, and took Samuel to the police station. When Samuel arrived at the station, the police

---

1. Caldor was unable to present evidence that there had ever been a theft, much less that Samuel was the culprit. Caldor produced "cash underage" reports from certain cash registers, which could have resulted from accounting or cashiering errors. As the majority notes, Caldor never produced the alleged videotapes.

removed one handcuff and attached it to a table. Samuel remained handcuffed to the table for several hours.

Samuel was thereafter prosecuted in a juvenile delinquency action. He was acquitted in light of the insufficiency of the evidence against him.

The incident greatly upset Samuel. He felt "defaced." People who had been friendly with him before the incident had seen him in handcuffs; several people refused to speak with Samuel after the incident. This, he said, "hurt a lot." His feelings were deep; he said that the hurt "really sunk in." After the incident, Samuel lost interest in the people and activities which he had enjoyed before. For example, according to Samuel's statements described in a psychologist's report, Samuel had "previously ... been socially active, into sports, including the baseball team at his high school and as having a very active life. He now stays by himself, goes to his room and shuts the door.... His life is much more involved in day dreaming rather than an actual participation...." He isolated himself from others because he was embarrassed by the incident and feared that other people would talk about him. Samuel worried that, even though he had been acquitted of any wrongdoing, he had lost some of the trust his parents had in him. He began to lose weight and had trouble sleeping. These feelings persisted for over a year. Finally, Samuel decided that he wanted to talk the situation over with a professional, to try and determine why he was still disturbed so long afterwards.

Although by the time of trial Samuel had managed to work through most of his feelings, the incident still haunted him. When applying for jobs, he had to disclose on the applications that he had been arrested. Samuel aspires to become a police officer. When he applied to a law enforcement agency for employment, he was subjected to a polygraph test because of the arrest on his record.

## II.

The majority holds that Samuel failed to establish a cause of action for intentional infliction of emotional distress because, in the majority's view, "there was legally insufficient evidence at trial from which a jury could properly have concluded that Bowden suffered the sort of emotional harm required...." 330 Md. at 644, 625 A.2d at 964. The majority describes his emotional distress as "uncomfortable" but states that Samuel did not have "the severely disabling emotional response that hindered his ability to carry out his daily activities...." *Ibid.* · The majority infers that Samuel was able to "continue his normal activities," seemingly faults the plaintiff for presenting "no expert testimony as to any emotional distress," and concludes that Samuel's "own description of his discomfort was insufficient to establish severe emotional distress." 330 Md. at 645, 625 A.2d at 965.

In my view, there was evidence from which the jury could reasonably conclude that Samuel suffered sufficiently severe emotional distress to establish a cause of action. Moreover, where a defendant intentionally engages in extreme and outrageous conduct, causing the plaintiff substantial emotional distress, I do not believe that the plaintiff must establish that the emotional distress disabled him or her from engaging in employment or other major daily activities.

While the majority's inference that Samuel "continued doing the same things that he did prior to the incident" and "continued his normal activities" may be supported by certain evidence, a contrary inference could also be drawn from the evidence. Samuel specifically testified that his social activities had changed, that he did not engage in the types of social activities which he had before the Caldor incident, that he now "stayed to myself," and that he no longer has a relationship with certain people with whom he had earlier been friendly. As previously mentioned, his involvement in high school athletics had changed.

The majority points out that Samuel obtained other employment soon after the Caldor incident. Nevertheless, Samuel's mother testified that, although Samuel obtained a job at another retail department store (Montgomery Ward), his mother made him quit the new job shortly after he obtained it. She was afraid that a Caldor official might learn of his employment at Montgomery Ward and that something might happen to him there. Samuel's mother also testified that, as a result of what happened to him at Caldor, Samuel has been nervous, worried and depressed. She testified that she keeps telling Samuel to "just try to hold yourself together. You know, just keep praying." Her testimony continued:

"A. Before this happened, he was a very happy boy, a happy person. He was very well pleased with the Caldor job.

"Q. You have to keep your voice up, please.

"A. He was very well happy. He was very well, you know, pleased with his job and he was looking to be eventually promoted or elevated.

"Then after this happened, it made him very depressed. He was worried. He was nervous and embarrassed about different things and, you know, people who know this. He was upset."

In light of the evidence, the jury could reasonably infer that, because of Caldor's intentional conduct, Samuel's ability to carry out his daily activities was hindered and that he did not continue doing the same things which he had done earlier.

The majority opinion characterizes Samuel's emotional distress as "uncomfortable." 330 Md. at 644, 625 A.2d at 964. I suggest that if the same thing had happened to most people, the resulting distress would have been considered more than "uncomfortable." The testimony disclosed that Caldor's conduct produced in Samuel very strong and debilitating negative emotions: shame, humiliation, embarrassment, nervousness, worry, distress, sadness, insecurity, dis-

trust, confusion, and inferiority. Samuel suffered from these debilitating emotions for over a year, and is still affected to some degree. Under the evidence, the jury was entitled to draw the inference that Samuel's emotional distress was much more severe than "uncomfortable."

The majority also relies on the facts that Samuel did not seek psychological assistance until the eve of the litigation and that he failed to present expert testimony as to any emotional distress. I am not aware that our cases involving the tort of intentional infliction of emotional distress require, as a precondition for recovery, that the victim immediately seek psychological counseling and that he present expert testimony as to the emotional distress. There are myriad reasons why a severely distressed person might not have sought psychological counseling immediately. With respect to expert testimony, it seems to me that the best evidence concerning the effects upon a victim of outrageous conduct would be the testimony of that victim and the testimony of knowledgeable family members. For the most part, in this context, the testimony of an "expert" is going to be based on what the victim told the expert. This is reflected in the psychologist's report which was introduced in the present case.

Our prior opinions in tort cases indicate that courts should be most reluctant to take cases from the jury or overrule the jury on factual matters. In *Impala Platinum v. Impala Sales, supra,* 283 Md. at 327–328, 389 A.2d at 905–906, Judge Orth for the Court summarized Maryland law as follows (emphasis added):

"A party is not entitled to judgment n.o.v. unless the facts and circumstances so considered [in the light most favorable to the non-moving party] are such as to permit of only one inference with regard to the issue presented. Here, the evidence and all inferences fairly deducible therefrom were sufficient to lead to conclusions from which reasonable minds could differ, so that the issue was not one of law for the court but was one of fact for

the jury with the weight and value of such evidence left to the jury."

\* \* \* \* \* \*

"As with respect to a judgment n.o.v., in considering a motion for a directed verdict the trial court assumes the truth of all credible evidence on the issue and of all inferences fairly deducible therefrom, and considers them in the light most favorable to the party against whom the motion is made.... If there is *any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue,* then a trial court would be invading the province of the jury by declaring a directed verdict."

Turning to the case at bar, the jury was fully instructed on the law and the requirements with regard to intentional infliction of emotional distress, and neither the majority nor Caldor complains about the instructions. Applying these legal principles to the evidence, the jury found severe emotional distress. There was more than "slight" evidence supporting the jury's finding. Simply because the circuit court or this Court might disagree with the jury does not, under our cases, authorize the Court to set aside the jury's verdict.

Furthermore, I question the majority's apparent view that whenever a defendant's extreme and outrageous conduct causes the plaintiff to suffer substantial emotional distress, the emotional distress must be so severe as to disable the plaintiff from engaging in his or her principal daily activities for an indefinite period of time. Our cases simply do not support this notion.

After this Court recognized the tort of intentional infliction of emotional distress in *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977), the first case in this Court involving an asserted cause of action for intentional infliction of emotional distress was *Lusby v. Lusby,* 283 Md. 334, 390 A.2d 77 (1978). There, a woman sought damages from her husband and others for extreme and outrageous intentional acts of

violence against her, claiming, among other things, intentional infliction of emotional distress. Mrs. Lusby did not allege, however, that the attack on her disabled her from performing her daily activities.[2] After detailing the extreme and outrageous conduct committed upon Mrs. Lusby, and after ruling that interspousal immunity was no defense, this Court remanded the case for trial. Significantly, the Court did *not* say that Mrs. Lusby had to show that she was disabled from performing her daily activities in order to recover.

The most recent case in this Court involving an asserted cause of action for intentional infliction of emotional distress is *Faya v. Almaraz*, 329 Md. 435, 441, 620 A.2d 327, 330 (1993). In that case a surgeon, knowing himself to be HIV-positive, performed a major operation upon one of the plaintiffs. Thereafter, learning that he had developed full-blown AIDS, he performed a major operation on the other plaintiff. He did not inform either plaintiff about his condition. After the plaintiffs learned of the surgeon's condition, they allegedly "incurred injuries in the form of exposure to HIV and risk of AIDS, physical injury and financial cost resulting from surveillance blood testing for HIV antibodies, pain, fear, anxiety, grief, nervous shock, severe emotional distress, headache and sleeplessness." 329 Md. at 442, 620 A.2d at 330. Nevertheless, subsequent blood tests showed that the plaintiffs were "HIV negative, that is, free of the AIDS virus," 329 Md. at 443, 620 A.2d at 331. Nothing in the factual allegations, reviewed by this Court, indicated that the plaintiffs were disabled from performing their principal daily activities. This Court, however, reversed the trial court's dismissal of the complaint, holding that the plaintiffs could recover "for their fear and its physical manifestations which may have resulted" from the surgeon's conduct "for the period constituting their reason-

---

**2.** *See* record extract, as an appendix to the brief, in No. 167, September Term 1977, at 4–5. Mrs. Lusby's asserted cause of action for intentional infliction of emotional distress was set forth as Count III of her declaration.

able window of anxiety—the period between which they learned of [the surgeon's] illness and received their HIV-negative results." 329 Md. at 455–456, 620 A.2d at 337. While most of this Court's discussion in *Almaraz* was under the plaintiffs' negligence counts, the Court stated that, in light of the surgeon's conduct "and because the damages claimed on all counts are essentially the same, the trial judge erred in dismissing the other counts as well [including the count for intentional infliction of emotional distress]. As we see it, after viewing the allegations of the complaints in support of these counts, dismissal was not appropriate in the circumstances." 329 Md. at 460–461, 620 A.2d at 339.

What the majority in the present case fails to recognize about the tort of intentional infliction of emotional distress is that there is a close relationship between the severity element and the outrageousness element of the tort: if the defendants' conduct was sufficiently extreme and outrageous, the severity of the emotional distress need not be as great. The severity of the emotional distress "must be measured in light of the outrageousness of the conduct and the other elements of the tort," and the "nature of the conduct itself may provide evidence of the severity of the distress." *B.N. v. K.K.*, 312 Md. 135, 148, 538 A.2d 1175, 1182 (1988), *quoted in Figueiredo–Torres v. Nickel*, 321 Md. 642, 656, 584 A.2d 69, 76 (1991). *See also Harris v. Jones, supra*, 281 Md. at 570–571, 380 A.2d at 616, *quoting* Restatement (Second) of Torts § 46, comment j (1965) ("Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed"). Indeed, sufficiently outrageous conduct on part of the defendant might suffice to establish severe emotional distress as a matter of fact. As we said in *B.N. v. K.K., supra*, 312 Md. at 148, 538 A.2d at 1182, "if 'the acts of the defendant are so horrible, so atrocious and so barbaric that no civilized person could be expected to endure them without suffering mental distress, [a] jury may find as a matter

of fact that "severe" emotional distress resulted' " *See also, Reagan v. Rider,* 70 Md.App. 503, 513, 521 A.2d 1246, 1251 (1987).

In determining whether there was sufficient evidence to enable a jury to decide if the tort were present, we must examine the context in which the defendants' conduct occurred and the relationship of the defendants to the plaintiff. Our cases, including the cases most heavily relied upon by the majority, make clear that these considerations are critical. *Harris v. Jones, supra,* 281 Md. at 568, 380 A.2d at 615 ("In determining whether conduct is extreme and outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred"); *Figueiredo–Torres v. Nickel, supra,* 321 Md. at 654–655, 584 A.2d at 75–76 (discussing psychologist-patient relationship between the plaintiff and the defendant).

In the instant case, Caldor's conduct occurred in the broad context of an employment relationship. We addressed the special sensitivity of the employment context in *Harris v. Jones, supra,* 281 Md. at 569–570, 380 A.2d at 615–616, where we stated:

"In cases where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized by the courts. *See* F. Harper & F. James, Jr., *The Law of Torts* § 9.1, at 666–67 (1956); W. Prosser, *Law of Torts* § 12, at 56 (4th ed. 1971). Thus, in *Alcorn,* [*v. Anbro Engineering, Inc.,* 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216 (1970)], the court referred to comment e of the Restatement, *supra,* § 46, *i.e.,* that the extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests. In that case, the Supreme Court of California said that a plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage than if he were a mere stranger."

Additionally, the incident occurred in the emotionally delicate situation of accusing a person of committing a crime. The accused employee was a minor, inexperienced, and a member of a minority group which has historically been subject to discrimination. His accusers were significantly older, more experienced, and better educated than the accused employee. Some were also professional security personnel. All of these considerations are relevant in determining the extent to which the conduct was extreme and outrageous, and the severity of the emotional distress required.

The *Alcorn* case, discussed in *Harris v. Jones, supra*, is remarkably similar to the case at bar. We stated in *Harris*, 281 Md. at 569–570, 380 A.2d at 616, that in *Alcorn*, the Supreme Court of California

"there found an employer's conduct toward a black employee to be extreme and outrageous, and to support an action for intentional infliction of emotional distress where the employer, 'standing in a position or relation of authority over plaintiff, aware of his particular susceptibility to emotional distress, and for the purpose of causing plaintiff to suffer such distress, intentionally humiliated plaintiff, insulted his race [by calling him a "nigger"], ignored his union status, and terminated his employment, all without just cause or provocation.' (footnotes omitted) 468 P.2d at 218–19."

In the instant case, the defendants' conduct toward the plaintiff was even more extreme and outrageous than in *Alcorn*. Two of Caldor's security personnel imprisoned this teenager in a tiny room for many hours, preventing him from leaving or calling his parents. They threatened him, interrogated him and coerced a false confession from him. When he later voluntarily returned to the store with his mother to resolve the situation, other management personnel called him a "nigger" and told him that he would "burn" for a crime he did not commit, presumably because of his race. They cuffed his hands behind his back and marched him handcuffed through a public area to add to his humilia-

tion. In light of such extreme and outrageous conduct, the plaintiff was not required to make as strong a showing with regard to the severity of the emotional distress as a plaintiff might be other some other circumstances.

At any rate, however, the plaintiff was not required to demonstrate that the emotional distress was so severe as to disable him for an indefinite period from performing all of his principal daily activities. As this Court stated in *B.N. v. K.K., supra,* 312 Md. at 148, 538 A.2d at 1181, "[w]hile the emotional distress must be severe, it need not produce total emotional or physical disablement." The young plaintiff in the case at bar was not required to drop out of school or drop out of the work force in order to recover for intentional infliction of emotional distress.

Finally, the majority's requirement that, to recover for intentional infliction of emotional distress, one must have suffered a "disabling emotional response that hindered his ability to carry out his daily activities" (330 Md. at 644, 625 A.2d at 964), will likely work against many members of groups which have, unfortunately and through no fault of their own, suffered more discrimination, harassment and abuse in our society than that suffered by the majority of individuals. Many members of certain minority and socioeconomic groups, who have suffered discrimination and abuse, have developed a tougher hide than many other persons. Many of those who have more frequently been the victims of outrageous conduct have developed, from experience and necessity, the ability to continue functioning in their daily activities. While the emotional hurt may be as strong or stronger, the ability to function normally may be greater. Under the majority's formulation of the tort, however, those persons who are able to carry on with their principal daily activities will not be able to recover damages for their severe emotional distress resulting from extreme and outrageous intentional conduct. In its application, the tort will discriminate against those who have developed a degree of resiliency because of past discrimination. This result is contrary to logic, fairness, and our prior opinions.

## III.

The majority holds that the plaintiff, Samuel Bowden, cannot recover for abusive discharge because the evidence "does not show [that] the defendants were driven by an improper motive when they discharged Bowden. At most, the evidence indicates that Bowden was discharged because he was suspected of store theft." 330 Md. at 647, 625 A.2d at 966. The majority goes on to state that Caldor's "act may have been improper but, nevertheless, it is clear from the record that the reason for Bowden's discharge was the defendants' suspicion that Bowden stole money and merchandise." 330 Md. at 647, 625 A.2d at 966.

Again, the majority cannot resist the temptation of drawing its own inferences from the evidence instead of deferring to those inferences which a jury could reasonably have drawn. Even if the majority's inferences concerning the defendants' motives are supported by some evidence, there is ample evidence which supports contrary inferences. The defendants' alleged suspicions that Samuel had stolen anything were shown at trial to be utterly baseless. The jury could certainly have inferred from the evidence that the defendants' "suspicions" were merely pretexts, and that the defendants' had ulterior motives for discharging Samuel. The jury was entitled to infer from the racial slur and statement of Caldor's manager Forrester, coupled with the other egregious conduct by Caldor's personnel, that the defendants were motivated to discharge Samuel because of racial hostility. A discharge motivated by racial prejudice would clearly be in violation of Maryland public policy. In short, the majority pays lip service to the principle that all evidence and inferences must be viewed in a light favorable to the non-moving party, Samuel, but then does exactly the opposite; the majority here draws its own inferences in favor of the defendants.

I would instruct the Circuit Court for Baltimore City to enter judgment in favor of the plaintiff in accordance with the verdicts rendered by the jury.

Judge Bell has authorized me to state that he concurs with the views expressed herein.